GEORGE POLLEN AND ROBERT COLGATE v. THOMAS O. LE ROY AND DAVID SMITH.*

The plaintiffs agreed to sell and deliver to the defendants a quantity of soft English lead, of the "Walker, Parker & Walker brand," to arrive by the Providence, from Newcastle. The lead arrived at New York on the 6th of July, 1853. On that day the plaintiffs notified the defendants of its arrival, and requested them to receive and remove it. The defendants objected to the lead, and declined to consider it theirs, or at their risk. On the 7th, the plaintiffs again notified the defendants that lead was discharging from the vessel, which they claimed to be such as the contract of sale called for, and offered it to the defendants, who declined to receive or pay for the lead, or to have anything to do with it. *Held*, that this was a sufficient offer of performance and tender of the lead by the plaintiffs; and that they were not required to make or attempt a manual delivery of the whole quantity of lead, or of any part of it.

And the plaintiffs having, upon the refusal of the defendants to receive and pay for the lead, given them notice that they (the plaintiffs), should sell the lead for their account, and hold them responsible for any deficiency on the re-sale, and for the expenses of keeping and re-selling the article; *held*, that assuming that the lead offered, was of a character to satisfy the contract, the plaintiffs were authorized to sell the same, in the ordinary way of selling metals by a broker, for the highest market price, without notice to the defendants of the time and place of sale. And that having so sold the property, they might recover of the defendants the difference between the contract price, and the proceeds of the sale, together with all expenses necessarily incurred.

*Held*, also, that in an action brought for that purpose, evidence of the re-sale of the property, and of the resulting loss, together with the expenses, was properly admitted; and that in the absence of any other evidence upon that subject, the jury were properly instructed to make that the measure of damages, if they should find for the plaintiff.

The difference between the agreed price of an article, and its market value at the time of delivery, is the actual damage sustained by a vendor upon a refusal by the vendee to accept the property sold, and the vendor may ascertain or liquidate this amount by a re-sale; taking all proper measures to secure as fair and favorable a sale as possible.

Although the law regards the vendor, if in possession of the goods, as the agent *quoad hoc* of the vendee in such a case, yet it is no part of such an agency, or of the duties involved in it, to notify the principal of the time and place at which the goods are to be sold, or exposed for sale.

The ordinary usage of the trade being to effect sales of pig lead through the negotiation of brokers, a vendor is bound to adopt that method, upon

* Decided September Term, 1863.

re-selling the goods because of the refusal of the vendee to accept them.

Where an ambiguity exists in a bought and sold note, from its describing an article which does not exist, evidence by an expert to show how the article mentioned therein is ordinarily spoken of, in trade and conversation, is competent in explanation of the ambiguity.

Where a sale was concluded by a bought and sold note in writing, containing all the elements of a contract, the names of the parties, price, description of the article, time of delivery and time of payment; *Held,* that it was not competent to vary this by asking a witness " what conversation passed on the subject of this sale, prior to the actual delivery to the respective parties of the sale note." That the question was too broad, and the answer would have introduced matter, both irrelevant to the issue, and improper in itself.

The plaintiffs agreed, through a broker, to sell and deliver to the defendants " 150 tons soft English lead of W., P. & W. brand," to arrive by a specified vessel. The defendants, on the arrival of the lead, refused to receive it, on the ground that it was not the brand called for by the bought and sold note. There being some evidence tending to prove that lead of the brand " W., P. & W." had been seen in the New York market; *Held,* that this rendered it proper to submit to the jury the question whether such a brand was in existence, so as to enable the plaintiffs to comply literally with the contract.

And the jury having by their verdict determined that no such article existed in the trade, as the contract between the parties described, and that there was no firm of W., P. & W. in existence; *Held,* that the lead on board the vessel having been manufactured by a firm, two of whose members were named W., and one P., known as " W., P., & Co.," and being the only firm composed of individuals of those names, engaged in the business, and such lead being branded by them, " W., P. & Co., the contract was satisfied by a delivery of that lead.

Where a contract for the sale of lead, required that it should be " soft English lead;" *Held,* that it was not erroneous to leave it to the jury to say whether by " soft English lead," was known in commerce soft lead made in England, no matter from what ores.

*Appeal from a judgment of the Superior Court of the city of New York.*

THE action was to recover damages for the non-performance of a contract of sale of certain lead, brought by the plaintiffs, as vendors, against the defendants, as vendees. The complaint alleged a sale of "one hundred and fifty tons of best English lead, of Walker, Parker & Walker, brand, to arrive by ship Providence from Newcastle," a notice and a request to the defendants to receive the lead, and their refusal to do so. That upon such refusal the

plaintiffs gave notice to the defendants that they would require them to perform their contract, and should sell the lead for their account, and hold them responsible for the deficiency, and for expenses, &c. That they did so sell, and the deficiency and expenses were $4,923.68, for which they ask judgment. The answer denies the contract alleged in the complaint, and alleges that the lead sold there was soft English lead, branded Walker, Parker & Walker; denies that any such lead was on ship Providence, but avers that the lead she brought was hard and refined; denies that they were ever requested to receive such lead as they bought; denies that the lead on this ship, or which was tendered to the defendants, was soft English lead, branded Walker, Parker & Walker, or was such lead as the defendants had agreed to purchase, or was manufactured by Walker, Parker & Walker, or was of their brand. Alleges that the lead which arrived by this ship and was tendered to the defendants was branded Walker, Parker & Co., which was an inferior brand; denies damage by the plaintiff, and counter-claims damage for a breach of the contract by the plaintiff. There is a reply denying the other matter of the answer.

At the trial the plaintiffs proved a sale note, signed by Turrell Brothers, brokers: "Sold T. O. LeRoy & Co., for account of Pollen & Colgate, one hundred and fifty tons soft English lead, of Walker, Parker & Walker brand, to arrive per Providence from Newcastle, at six and five-eighths cents per pound, cash." They gave evidence that no lead branded Walker, Parker & Walker was known in market; that there was lead branded " Walker, Parker & Co.," and " Walker, Parker & Co., Newcastle-upon-Tyne," and "Walker, Parker & Co., London." There was also evidence that these brands or marks indicate different qualities of metal, and on the other hand that they indicated only the place of manufacture of lead of the same quality, made by the same house, having establishments in different places. This lead arrived July 7th, 1853, and the evidence

was that it was marked " Walker, Parker & Co., Newcastle-upon-Tyne." The plaintiffs proved the re-sale and quality of the lead, under objection and exception by the defendants. They proved the account of the re-sale of the lead, and its delivery to the defendants, the defendants objecting that it was incompetent and irrelevant because there had been no notice of the sale and no tender. Certain testimony of members of the firm of Walker, Parker, Walker & Co., and persons in their employ, taken by commission, was read. One of these witnesses testified that the lead of this shipment was branded Walker, Parker & Co., and not Walker, Parker, Walker & Co., because the pigs were cast shorter than usual, to suit the American market, and were too short to be branded with the full name of the firm, and that there was no difference in quality in lead marked either way. This was objected to and overruled, and the defendants excepted. The same witness testified that his firm was the only house in this trade of the same or a similar name, and no lead known in trade as that of Walker, Parker, Walker & Co., except this. To this the defendants objected and excepted. He testified that the description " soft English lead, Walker, Parker & Walker brand, from Newcastle," would designate, with the same certainty, soft lead cast by Walker, Parker, Walker & Co., with the brand Walker, Parker & Co., as the soft lead cast by them marked Walker, Parker, Walker & Co., and that there is no difference in the market value of these brands. This was objected to and the defendant excepted. Similar objections were taken to similar testimony, and other exceptions.

The plaintiffs rested, and the defendants moved for a non-suit, because the agreement was for lead of a particular kind, which was not on the ship Providence. 2d. Both parties were mistaken as to the lead on the ship, if there was no lead of that brand, and there was, therefore, nothing for the contract to operate upon, and the plaintiffs cannot recover by showing the delivery of another article.

3d. There is no evidence of damage, because the re-sale was made privately and without notice to the defendants. 4th. That the plaintiffs, by taking the lead and selling it, rescinded the contract, and can bring no action founded on it. 5th and 6th. Repeating the allegations of non-performance of the contracts. The non suit was refused and the defendants excepted. The defendants then gave evidence on the points to which the plaintiffs' evidence was addressed, and also to prove that this firm used foreign as well as English ores. One of the defendants was called and testified that he had a conversation with Turrell before the sale note was delivered, and was asked what conversation passed on the subject of this sale, prior to the actual delivery to these parties of the sale note. The question was objected to and excluded, and the defendant excepted. A manufacturer of white lead was called, and among other things was asked "what kind of lead is required to make white lead?" The question was objected to and excluded, and the defendant excepted. The same witness testified to receiving this lead and rejecting it because of the mark not being Walker, Parker, Walker & Co. He was looking to buy for one Stearns. He was asked if Stearns had arranged to purchase this lot of the defendants. This evidence was objected to and excluded, and the defendants excepted. Pollen, one of the plaintiffs, was sworn, and asked how the lead manufactured by the Walker house was known in market; how it was generally spoken of by persons who alluded to it. The question was objected to and the objection was overruled, and the defendant excepted. The witness answered, "we generally speak of it as the Walker lead." A witness testified that he had bought lead marked Walker, Parker & Walker. There was evidence given by the partners of the English house that Pollen & Colgate had not paid for the lead, and that this suit is prosecuted for their benefit. At the close of the testimony the defendants again moved for a non-suit, on the ground that there was evidence of the existence of

the lead called for, and because the plaintiffs had no interest in this action. The motion was denied, and the defendants excepted. The defendants' counsel submitted five propositions, or requests, to charge. The court declined to charge except as in the charge given, and an exception was taken. The court charged, and various exceptions to the charge were taken, which are noticed in the opinion.

The jury rendered a verdict in favor of the plaintiffs for $7,580.34, and judgment was entered for that sum, with costs. A motion for a new trial was denied, and the general term affirmed the order and judgment (see 10 Bosw. 38, S. C.), whereupon the defendants appealed to this court.

*William Curtis Noyes*, for the appellants.

*George F. Comstock*, for the respondents.

EMOTT, J. The lead which was the subject of the sale by the plaintiffs to the defendants, arrived at New York, on the 6th of July, 1853. On that day the plaintiffs notified the defendants of its arrival, and requested them to receive and remove it. On the same day, the defendants objected to the lead, and declined to consider it theirs, or at their risk. On the 7th, the plaintiffs again notified the defendants that lead was discharging from the vessel, which they claimed to be such as the contract of sale called for, and offered it to the defendants. In answer to this, the defendants verbally declined to receive or pay for the lead, or to have anything to do with it. This was a sufficient offer of performance and tender of the lead by the plaintiffs. They were not required to make, or attempt a manual delivery of the whole 150 tons of lead, or of any part of it. It was sold on ship board, to arrive at a future day, and it was enough that the plaintiffs notified the defendants of its arrival, and requested them to take it as it was discharged from the vessel. The defendants' answer, indeed, admits a

tender of lead which arrived on the ship Providence, but denies that this lead answered the description of the contract. The plaintiffs allege in their complaint, that upon the defendants' refusal to receive and pay for the lead, they gave notice to said defendants that they should sell the lead for their account, and hold them responsible for any deficiency on the re-sale, and for the expenses of keeping and re-selling the article. This is not denied by the answer, and the consequent admission is of the whole of the facts in the case, on the subject of notice of the plaintiffs' re-sale of the article. At the trial the plaintiffs proved, under objection and exception by the defendants, the re-sale, the expenses of keeping the lead, and the proceeds of the re-sale. This sale was made on the 13th of July, and was for the highest market price on that day. It was made in the ordinary way of selling metals, by a broker, and seems to have been fair in all respects. There was no other evidence given of the value or market price of the article between July 7th and 13th, or upon the question of damages. The defendants insisted, upon a motion for a non-suit, that there was no competent proof of damages, but the court denied the motion, and subsequently instructed the jury that if they found the plaintiffs entitled to recover, their damages would be measured by the loss shown by the result of the re-sale, with the expenses which were proved. Assuming that the lead offered by the plaintiffs was of a character to satisfy their contract, and that the defendants were therefore in default, the vendors had a right to dispose of the lead as soon as they could, with due regard to the interests of the vendees, and after having given them notice of their intention, and to hold the latter responsible for the difference between the agreed price, and the sum realized, together with all expenses necessarily incurred. It cannot be necessary to adduce either authority or argument to support a rule so constantly recognized in the law of sales as this is; unless upon some theory that nothing is settled in these days, except what is to be found in a recent decision

of this court. But it is strenuously contended that it is a part of this rule that the result of such a re-sale can neither control the question of damages against a defaulting vendor, nor be given in evidence for such a purpose, unless the vendor gives notice to the vendee of the time and place of the proposed re-sale, as well as of his intention to make it. There is not the slightest foundation, however, either in principle or authority for such an addition to the rule as I have stated it. The rule itself is founded upon good sense and justice, and was probably adopted by usage and consent before it was sanctioned by the courts, as was observed in *Sands* v. *Taylor* (5 J. R. 395.) A vendor in such a case, may, if he choose, abandon the property, treat it as the vendee's, and sue the latter for the price. But it can hardly be for the interest of the latter that he should do so, and especially not in the case of perishable property, when the result might be a total loss to the vendee. He may, therefore, sell the property as speedily as possible, and recover the deficiency, together with his expenses, as damages. This rule is the same in all sales, and in respect to property of every description. As was said by BEST, CH. J. in *Mac Lean* v. *Dunn* (4 Bing. 722), if articles are not perishable, price is, and he adds: "It is a practice founded on good sense to make a re-sale of a disputed article, and to hold the original contractor responsible for the difference." The difference between the agreed price of an article, and its market value at the time of delivery, is the actual damage sustained by a vendor upon the refusal by a vendee to accept the property sold, and the vendor may ascertain or liquidate this amount by a re-sale, taking all proper measures to secure as fair and favorable a sale as possible. The law regards him, it has been said in some of the cases, if in possession of the goods, as the agent *quoad hoc* of the vendee. But it is no part of such an agency, or of the duties involved in it, to notify the principal of the time and place at which the goods are to be sold, or exposed for sale. Indeed, in a majority of cases

such a notice would be entirely impracticable, as it would have been in this. Unless the sale is to be public and at auction, no notice of the time and place can be given. But in very many cases, sales by auction are not the usual, nor are they a favorable mode of disposing of merchandize. There is nothing in the present case to show that sales by auction are customary in trade in metals, and there is every reason to infer that such a sale would have resulted much more injuriously to the defendants than the course pursued by the plaintiffs. The ordinary usage of the trade is to effect sales of pig lead through the negotiation of brokers. This usage the plaintiffs were bound to adopt, to obtain the full and fair value of the article. But it was manifestly impossible to give previous notice of the time and place of sale thus effected. On the other hand, if the lead had been sent to auction, it is not likely that any notice of the time and place would have saved the plaintiffs from complaint of the enhanced loss which so unusual a mode of disposition would have entailed. That complaint would have been more difficult to answer than the present. There is no analogy in this particular between this case and that of a pledge. The pledgee is not the owner, nor the agent of the owner. He is clothed with the possession and with a right to sell the property, in order to repay himself a debt. Unless he resorts to judicial proceedings to extinguish the right of his debtor, he is bound to give notice to the latter such as would be involved in such proceedings, both to redeem his property by payment, and of the steps by which he proposes to extinguish his title, and satisfy the debt in default of payment. A vendor, on the contrary, is simply an agent, if he elect to become such, of a vendee who refuses to complete his purchase; an agent to sell the property fairly, and to the best advantage. The only requisite to such a sale as a measure of the rights and the injury of the party, is good faith, including the proper observance of the usages of the particular trade.

There is nothing in any of the cases which I have found

requiring more than this, with the exception of one recent decision of the supreme court in this state. The rule was stated and approved by HOLT, in *Langfort* v. *Tiler* (1 Salk. 113; S. C. 6 Mod. 162), without the qualification contended for by the defendants' counsel; and although in one case at *nisi prius* in the English courts, it was denied by Lord ELLENBOROUGH (3 Campb. 426), it was subsequently fully reinstated. (*Boorman* v. *Nash*, 9 B. & C. 145; *MacLean* v. *Dunn*, 4 Bing. 722.) In none of these cases was any notice of the time and place of sale given or required. In our own country, in the leading case of *Sands* v. *Taylor* (5 J. R. 395) already cited, the re-sale was made by auction, and notice given to the vendee of the time and place of the sale. But there is nothing in the opinions delivered by the judges in that case requiring or insisting upon such a course. The artitle was wheat. No question was made as to the mode of re-sale, and it seems to have been taken for granted that a sale at auction was a customary mode of disposing of such a commodity. In *Bement* v. *Smith* (15 Wend. 493), the rule was extracted from the cases, especially that of *Sands* v. *Taylor*.) No such qualification or addition was stated, and none such can have been supposed to exist. The superior court of New York, in *Crooks* v. *Moore*, upheld a re-sale by a vendor upon a vendee's default, through a broker and without notice of time or place, except that the goods would be put in market the next day. The only case to the contrary to which we have been referred is *McEachron* v. *Randles* (34 Barb. 301). The judgment of the supreme court in that case can be upheld on other grounds, but the opinion of the learned judge upon that point can not, I think, be maintained upon principle or by the authorities. The evidence of the re-sale and the resulting loss, together with the expenses, was properly admitted in the present case, and as there was no other evidence of damages, the jury were properly instructed to make this the measure, if they found for the plaintiff.

The defendants objected to the admission of evidence offered by the plaintiffs to show the reason why the same lead manufactured by the firm of Walker, Parker, Walker & Co. was sometimes marked with the full name of the firm, and sometimes "Walkers, Parker & Co.," and that there was no difference in lead with these two different marks. If there had been shown to have been any lead in market of the precise description, or with the brand described in the contract between these parties, this evidence would probably have been immaterial. But the jury have found that there was no such mark or brand of the article known, and at the stage of the case when this evidence was received, there was no evidence tending to show the existence of any such brand of lead. There was no firm with these names in the trade besides the firm of Walker, Parker, Walker & Co., in England, from whose members and employees this evidence was obtained. Under these circumstances the facts to which I have referred were properly received to explain the meaning of the parties, and upon the main issue to which I shall presently refer. Similar considerations will dispose of the objection to the evidence to show how the lead made by this house was ordinarily spoken of in trade and in conversation. This was competent in explanation of the ambiguity which had arisen in respect to the contract, assuming the bought and sold note to describe an article which did not exist.

The defendants' counsel asked one of the defendants who was a witness, and who negotiated the purchase from the broker, "What conversation passed on the subject of this sale, prior to the actual delivery to these respective parties of the sale note?" This was objected to and excluded. The sale was concluded by a bought and sold note in writing, containing all the elements of a contract: the names of parties, price, description of the article, time of delivery and time of payment. It certainly was not competent to vary this by evidence of what passed in the previous negotiations. Evidence of fraud, or of a warranty,

was not admissible under the pleadings in this case. The only issue is the contract and its performance as to the specific article sold and tendered. It may be that evidence of conversation between the parties as to the article intended might be competent in the state of facts which was developed in that particular, although it is not necessary to concede as much as this. But the difficulty with the question which was excluded in this instance is that it was too broad. The witness was not asked if anything was said in reference to the brand or description of lead, or what was said upon that subject; but he was asked what conversation passed on the subject of the sale, before it was concluded. This was too general an inquiry, and does not present the point discussed on the present argument. The answer would have introduced matter both irrelevant to the issue and improper in itself.

There was no error in rejecting evidence to show that the lead tendered to the defendants was not fit for the manufacture of white lead. No issue was offered or made by the answer or otherwise, upon any warranty or representation to that effect. There is an allegation in the answer that the lead was unfit to make white lead, but neither in the pleadings nor in the proof is there anything to show that it was represented to be suitable for that purpose; and the denial, in the reply, of the averment, in the answer, that it was not fit for such manufacture, did not require the court to receive evidence upon an immaterial issue.

The defendants took a variety of exceptions to the charge of the judge. The principal question in the case, whether there was any such article as lead of Walker, Parker & Walker's brand, was left to the jury, with instructions that if there was any article of that name ever sold in New York market known among dealers as an article of merchandize, the plaintiffs were bound to deliver that identical article. That such an article must be known among dealers as an article of merchandize, however, and it would not

be sufficient to this end if an importer had transferred such lead to a manufacturer, and no other dealers in lead had ever heard of it. The jury were told again that the first question for them was whether the plaintiffs could have furnished an article of this kind so as to have complied with the precise terms of the contract; and again to inquire whether there was an article known in the trade as Walker, Parker & Walker's brand. . This was the substance of the instructions to the jury upon the first question submitted to them as to the performance of the contract, and most of these directions were excepted to. That the question whether there was, in fact, such an article as the lead mentioned in the contract, was a question for the jury, admits of no doubt in the present condition of the cause. When the cause was here before, the court assumed as a fact what indeed there was no evidence to controvert, to wit: that there was no such brand or description of lead as that specified in the contract. Upon that assumption this court held that the question what the parties intended to sell and to buy should have been submitted to the jury. There was some evidence on the present trial tending to prove that lead with such a mark had been seen in the New York market, and this rendered it proper to submit to the jury the question whether such a brand was in existence, so as to enable the plaintiffs to comply literally with the contract. I see no error in the manner in which this question was submitted. The parties entered into the contract as merchants, and made use of the language "one hundred and fifty tons soft English lead, Walker, Parker & Walker brand," as terms of trade and art, to describe the commodity bought and sold. It is not language intelligible to ordinary persons who are not dealers in the article, and we are to assume that they used it with reference to the trade and the market. The question was not whether pigs of lead had ever been seen by anybody with such a mark upon them, but whether the parties knew, or should be presumed to have known, such

36

a brand as dealers, and whether the plaintiffs could have procured and delivered it. It was an article of trade to which they referred, and the jury were correctly directed to determine whether there was such an article of trade as lead of the brand " Walker, Parker & Walker."

Nor was there any error in the remarks of the judge upon the testimony of the witness Jewett, who swore that he had seen and bought several thousand pigs so branded. If a number of witnesses have the opportunity and the interest to notice a particular fact if it occurs, and have their attention directed to it, and they do not have any knowledge of its occurrence, their testimony is more than mere negative testimony, and is entitled to more weight against a positive statement by another witness.

The jury by their verdict determined, as this court formerly assumed, that no such article existed in the trade, as the contract between these parties described. The court on the former appeal, as I have said, held that in that event, we were bound to ascertain whether the parties did not mean something by the language which they used, and what they meant. This was the next question left to the jury, and in a manner free from any just exception. The proposition, that if there was no such brand or mark known in the market, the parties were to be deemed to mean lead of a particular character, to be ascertained by comparison of the phrases in use in the market, was unexceptionable. It was in effect repeating what was held by this court. The judge recapitulated the facts as to the article of lead known as Walker, Parker & Co.'s brand in the market, and made by the only firm composed of individuals of these names, and he left it to the jury to say, whether lead made by their firm, and branded with their name, would or would not be known as such an article as the contract called for, there being nothing known in market exactly answering its description and calls. I perceive nothing in this but an application to the particular facts disclosed on the trial of the rule given by this court for this part of the case. The

jury might properly say upon this evidence that these parties meant by their contract, lead of Walker, Parker & Walker manufacture. If there was no such brand or trade mark known as that specified in their contract, it was not an unreasonable interpretation of their language, to hold that they intended soft English lead, manufactured by the house of Walker, Parker & Walker, who were well known in the trade. It is indeed, very difficult to resist the conclusion that the article offered by the plaintiffs to the defendants, was the very article intended and specified by the contract, and that the language employed in the bought and sold note, and which described no known brand or style of manufacture, was simply a mistake or an incorrect description of what was intended.

The contract required that the lead should be soft English lead. The defendants contended that nothing would answer this description but lead made wholly of English ores. The judge did not reject this definition, but left it to the jury to say whether by soft English lead was known in commerce soft lead made in England, no matter from what ores. This certainly was all that the defendants could ask on this point.

With regard to the amount of this verdict, that was fixed by a calculation accepted by the court, and given to the jury in the charge without exception. The various principles by which the verdict was to be determined were excepted to, but the amount of the result, if the verdict was for the plaintiff, was not questioned at the trial. There was no motion to set aside the verdict for excessiveness, and the question of correctness in respect to the kind of ton computed, or the computation made, is not before us. There is no objection to allowing the defendants to apply to the court below to correct any error in this respect if they see reason to do so. The judgment is not open to any other objection, and should be affirmed, with costs, but with leave to apply to the supreme court to correct the verdict.

All the judges concurring, judgment affirmed.