Lewis *v.* Greider.

[Monroe General Term, September 2, 1867. *J. C. Smith, Welles* and *Johnson,* Justices.]

LEWIS and COBB *vs.* GREIDER, survivor, &c.

One purchasing property for others merely as their agent, and depending for the measure of his compensation upon the amount of profits realized by his principals from the transaction, is not a partner with them in the property so purchased.

And, although interested in the amount which may be recovered in an action brought by his principals against purchasers, to recover damages for a breach of their contract to buy such property, not being a part owner of the property, he need not be joined as a plaintiff therein.

The refusal of purchasers either to pay the money, give security, or do any other act in fulfillment of the contract, gives to the vendors the right to sell the property on the purchasers' account, and to hold them responsible for a deficit in the price.

It is not necessary, in such a case, for the vendors to give the vendees notice

Lewis *v.* Greider.

either of the time or place of sale. General notice of their intention to sell is sufficient.

The law, in such a case, constitutes the vendor in possession of the goods the agent of the vendee, for the purpose of such sale. As such agent, he must act in good faith, and take proper measures to secure as fair and favorable a sale as possible.

Vendors are not restricted, under such circumstances, as respects the place of *sale*, to the place of *delivery* of the property named in the contract, nor to a *time* necessary for reasonable notice, after the right to sell accrues; but if the property cannot readily be sold at the place of delivery fixed by the contract, or a better and more advantageous sale can be effected elsewhere, it is the duty of the vendor to go where he can get the best price and readiest sale, not out of the usual course and channels of trade in marketing such property. Such sale should be within a reasonable time.

The presumption is that a referee did not overlook the terms of a memorandum of sale, or fail to consider it as it stood at the time of the trial in weighing the evidence upon a disputed question of fact. It is for the party complaining of the report to show clearly that such a mistake has occurred, before he can ask the court to act upon it.

APPEAL by the defendant, from a judgment entered upon the report of a referee.

The action was brought by the plaintiffs against the defendant and Samuel R. Bear, as copartners in business, to recover of them damages for their breach of a contract to buy of the plaintiffs a quantity of barley. It was begun by the publication of summons and by attachment, the defendants being non-residents of this state, and the defendants appeared in the action by attorney. The issues formed by the pleadings in the action, were on the 13th of November, 1865, at the Ontario circuit, referred to the Hon. Addison Gardner, as sole referee, to hear and determine, and to render a judgment in the action. The action was tried before him and submitted to him with oral argument on the 13th of January, 1866. On the 27th of January, 1866, the referee made his report, by which he found:

That prior to, and on the 7th day of December, 1864, the plaintiffs were copartners, and since and hitherto have been partners in the business of buying wool, grain, &c. at Geneva, in this state; that the defendants, during the same

period, were also copartners, doing business as maltsters in the town of Mount Joy, in the state of Pennsylvania; that on or about the day last aforesaid, the defendant Greider, in behalf of the copartnership of which he was a member as above mentioned, made with the plaintiffs the agreement for the purchase and sale of barley in the complaint stated and set forth; that during the negotiation preceding the making said agreement, Greider inquired of the plaintiffs whether they had samples of the barley at that time in the storehouse mentioned in the complaint; that he was informed by the plaintiffs that they had not; that they had not seen the barley, but that it was purchased in the neighborhood of the Seneca lake, a region noted for raising good barley, and they presumed this was good, and that the lot in store contained the usual proportion of two and four rowed barley; that the defendant on his way up the lake had better stop at the landing where the barley was stored and examine its quality; that $3000 was paid by the defendants at that time upon said agreement, as stated in said complaint; that the plaintiffs, in pursuance of said contract, proceeded to purchase and did purchase and have in store at said landing, as early as the 5th of January, 1865, about 1700 bushels of barley in addition to the 3000 in store at the time of the making of said agreement as aforesaid; that early in the month last mentioned the plaintiffs wrote and mailed a letter to the defendants, addressed to the latter at their place of business, informing them of such purchase, but said letter was never received by the defendants or either of them; that subsequent to the making of said agreement, the plaintiffs delivered, and the defendants accepted, the quantity of barley mentioned in said complaint; that at the time of receiving said barley last mentioned, the defendants complained, and so wrote to the plaintiffs, that the said barley was unmerchantable, but they had finally concluded to receive it. That the plaintiffs, subsequent to the receipt of the letters last mentioned, wrote to the defendants to make with them an

Lewis *v.* Greider.

examination of the barley then in store at said ware-house, to the end that its quality might be ascertained before any further quantity should be shipped ; that in pursuance of such request the said Greider, one of the defendants, came to said landing, examined all the barley in store on that day, being the 6th of March, 1865, and after such inspection expressed himself satisfied with the quality of the same ; that on the 15th of March, in the year last aforesaid, the said Greider, in behalf of the defendants, applied to the plaintiffs and proposed, in lieu of money, to give the drafts of his firm on the National bank of Mount Joy aforesaid, for the price of the grain purchased by said defendants, the draft to run for three months, with interest from the first of the preceding month of February, and to be accepted by the cashier of said bank ; that this proposition was acceded to by the plaintiffs, but when the amount for which said drafts should be given was discussed between the parties, the defendants insisted that they should be given for $3000 and interest as aforesaid, being the balance due upon the three thousand bushels of barley in the ware-house at the time of entering into said contract, the defendants claiming that they had purchased that quantity, and no more, and had never authorized the plaintiffs to buy two thousand bushels, or any other quantity whatever. The plaintiffs, on the other hand, insisted that the contract was in substance and effect as now stated in their complaint, and claimed that the drafts should include not only the balance upon the three thousand bushels as above mentioned, but the value of the barley subsequently purchased by them according to the price stipulated in said contract. The defendants denied the existence of any such agreement as that last mentioned, and declined either to pay money and give security, or do any other act in fulfillment of it ; that the plaintiffs then notified the defendants that they should proceed and sell the barley on hand and obtained and purchased under said contract for account of the defend-

ants to the best advantage, and hold them responsible for the difference, if any, between the proceeds of such sale and the contract price of the same ; that the defendant Greider, in behalf of the defendants, forbid the plaintiffs to sell any barley of the said defendants, and the parties then separated. It was further proved that barley declined in price after the making of said contract, and that the said plaintiffs, after an unsuccessful attempt to sell the barley obtained under the said agreement and remaining in their hands after the 15th of March, as above mentioned, at Geneva, caused the same to be shipped to the city of New York, and there sold in the usual manner by a grain broker, for the best price that then could be obtained ; that the shipment and sale was made in good faith, for the purpose of disposing of the grain to the best advantage ; that the gross avails of the barley, as sold in New York, amounted to $4622.38 ; that the freight, storage, commissions and other necessary expenses amounted to $668.64, leaving the net avails applicable upon said contract $3953.74 ; that the whole amount of barley purchased by the defendants under the contract of the 7th of December above mentioned, was four thousand six hundred and sixty-three bushels and twenty-six pounds, which, at $2 per bushel, the contract price, would amount to $9327.05. From this deduct the $3000 paid by the defendants at the making of the agreement, and the balance would be $6327.05. The interest on this balance from the 1st day of February, the time fixed by the parties for that purpose on the 15th March, as above mentioned, to the 27th of May, 1865, the time when the avails of the barley sold in New York came to the hands of the plaintiffs, is $143.94, which added to the balance above mentioned, the aggregate would be $6470.99 ; from which last sum deduct the net avails of the sale aforesaid, and the balance thus found, with interest to the date of the report, would be $2634.70. It was further proved that John Coryell was employed by the plaintiffs to purchase grain, including that obtained under the foregoing contract ; that said plain-

Lewis *v.* Greider.

tiffs were to furnish the funds for such purchases, to be owners of the grain when bought, and dispose of the same exclusively, and the said Coryell for his services in the purchase of the same, was to receive one half the profits realized upon such sales.

The referee found as conclusions of law, from the facts above stated,

1st. That Coryell was not, in virtue of the arrangement above mentioned, a copartner with the plaintiffs in their business of purchasing and selling grain, nor had he any interest in the subject matter of this suit that required or authorized him to be made a party plaintiff.

2. That the notice given to the defendants by the plaintiffs of their intention as to the sale of the grain, and the application of the proceeds, as above set forth, was sufficient in law to authorize the sale made by them and the application of the proceeds upon the contract of the defendants.

3d. That the plaintiffs, after crediting the cash paid at the making of the agreement between these parties and the net avails of the barley sold and received by them on the 27th of May, 1865, were entitled to judgment for the balance remaining due according to said contract, with interest thereon to the date of the report.

From the judgment entered upon this report, the defendants appealed. After the service of notice of said appeal, the defendant Bear died, and the defendant Greider survived him.

*Angus McDonald,* for the appellants. I. The referee erred in deciding that the witness John Coryell "had no interest in the subject matter of this suit that required or authorized him to be made a party plaintiff." It clearly appears from the testimony that the barley purchased after December 7, (which is the barley in controversy,) was bought, all but one lot, for $1.80, and that lot for $1.85, and that the three thousand bushels bought before December 7, cost

$2. Hence, as the sale of both was for $2, and Coryell's interest or pay for buying was one half of the profits, his interest or pay depends entirely upon the decision whether the barley bought after December 7th was included in the contract of December 7th. And this was the exact question at issue between the parties before the referee. If the plaintiffs maintain their recovery against the defendants for $2 per bushel, then Coryell will be entitled to one half of the difference between the cost price, ($1.80, $1.85,) and $2; but if they do not, then he is not entitled to any thing, as the plaintiffs by their sales in New York *realized* less than $1.80 net. Hence, 1. Coryell is *directly interested* in the result of this action, and should have been joined as co-plaintiff therein. (*Code,* § 117. *Secor* v. *Keller,* 4 *Duer,* 416. *Fowler* v. *Atlantic Ins. Co.,* 8 *Bosw.* 332.)  2. It is admitted that by his contract Coryell was *not* a partner of the plaintiffs as to *third* persons, but we submit that under his contract he had a right to make the plaintiffs' *account,* and hence in this regard might claim to be a partner as between themselves.  3. But it is not necessary that the party sought to be made a party to an action under section 117 of the Code, should be *a partner* either as to *third* persons, or even between themselves. It is enough in the words of the Code, "that he is *interested* in the subject of the action and in obtaining the relief demanded." Under the proof, Coryell clearly comes within this requirement, and hence the motion for nonsuit should have been granted and the judgment must be reversed.

II. In the printed case the court will find, "It is agreed that the memorandum in the defendant's diary, dated December 7, 1864, shall be shown to the court on argument as it therein appears." This memorandum, as is certified by the referee, "was produced in evidence on the trial as it now appears." On the close examination of the memorandum, the court will see that at the end of the eighth line from the top the word "prime" is written in smaller handwriting, so that

Lewis *v.* Greider.

it reads, "Bought of Lewis & Cobb 3000 bushels prime barley at Lodi Landing." Now, by reference to the opinion of the referee, it will be seen that he had entirely overlooked the word "prime" and, what is more, has built up a portion of his argument and urged it against the defendant Greider, that the word "prime" was not in the memorandum. By the memorandum itself, certified by the referee, the referee admits his mistake, and thus not only entirely removes all foundation for his argument on the absence of any statement as to *quality* in the memorandum, but at the same time shows strong confirmatory evidence the fact that the word "prime" is in the memorandum would be to the evidence of Greider, that such was the contract. The referee declined to decide any thing on the testimony as it *in fact was*, having by mistake decided the case upon the evidence as *it was not*, and hence he simply certifies the evidence itself up to this court. But in such case we submit that the same rule should be applied as when the referee by mistake excludes *pertinent* testimony. If the court can see that such testimony, had it been admitted as it should have been, would properly have to be considered by the referee, they will not speculate as to the probable or possible effect it might or might not have had upon the mind of the referee, but will reverse the judgment and send the case back for a new trial. (*Union Bank* v. *Mott*, 39 *Barb.* 185.) So in this case, the referee has decided this action, and in his consideration and decision thereof has, · *by mistake*, omitted to consider pertinent testimony, although he had admitted it. Hence in both cases the error arises from the same cause, the mistake of the referee. The consequence of the error is the same, viz : the unsuccessful party does not have the judgment of the referee upon *all* the *pertinent* evidence which he produced or offered to produce on the trial, and hence has not had a *fair* and *impartial* trial, and therefore the remedy should be the same, viz, a reversal of the judgment. That the evidence not considered was pertinent and should have been considered by him, is shown by

his own opinion. We therefore submit that the judgment
below should be reversed for this admitted error of the referee.
If the court will examine the evidence in the case as to
whether the contract was for *prime* barley, especially letters
of dates of January 19 and January 24, of the defendants, and
the plaintiffs' answer of January 27, in which the defendants
repeatedly assert that the plaintiffs sold the grain as prime,
and the plaintiffs impliedly admit it ; and more especially, as
the other questions of fact were very close, and are all con-
nected together and depend entirely upon the *credibility* of
the parties, we submit it must come to the conclusion that
the only safe way is to adopt the rule laid down in *The Union
Bank* v. *Mott,* (39 *Barb.* 185.)

III. The referee erred in his second conclusion of law, viz :
" That the notice given to the defendant by the plaintiffs of
their intention as to the sale of the grain and the application
of the proceeds as above set forth, was *sufficient in law to
authorize the sale made by them,* and the application of the
proceeds upon the contract of the firm of which the defend-
ant is survivor. The third conclusion of law of the referee
is founded entirely upon the second, and hence if the second
is not sound, the third must fail also. The question at issue
is, under all the circumstances of this case, what is *the true
measure of damages ;* the *usual* one of the difference be-
tween the contract price and the market price, on the day of
the breach, or the one allowed by the referee, viz. the differ-
ence between the net avails of the sale in New York, May
16th, and the contract price. The breach of the contract was
on the 15th day of March. On that day the market price of
barley at the place of delivery was $1.90. The contract price
was $2. The whole amount of grain purchased by the de-
fendants of the plaintiffs was 4663 bushels and 26 pounds.
Of this amount 724 bushels had been delivered, and the
balance remaining in the hands of the plaintiffs March 15th,
1865, was 3939 bushels and 26 pounds. On December 7th
the defendants paid the plaintiffs on the contract $3000.

Hence if the first and ordinary rule of damages were adopted, the loss on the grain on hand, 3939 bushels and 26 pounds at 10 cents per bushel, difference between $2 contract price and $1.90 market price, would be $393.95. The interest on balance of purchase money from February 1st to March 15th, would be $55.36, making $449.31. But the plaintiffs had received $3000. They had delivered 724 bushels, which, at $2, would be $1448, leaving still in the hands of the plaintiffs $1552 to be applied on purchase price or loss of barley not delivered. But, as we have shown, the loss and interest according to this mode of measuring damages, would only be $449.31, and hence if this rule of damages is right, the *defendants would be entitled to a judgment against the plaintiffs* for the difference between $1542 money on hand, less the loss and interest $449.31, which is $1102.69 besides costs. Under the rule adopted by the referee, he has ordered judgment against the defendants for $2634.20 damages, and $344.20 costs. So that the difference between the two rules would be $2634.20 plus $1102.69, which amounts to $3736.89, and if the defendants had recovered judgment, and their costs had equalled the plaintiffs', there must be added to this, double the costs of the plaintiffs, viz, $688.40, which would make the difference in all $4425.29. Hence, besides being an important question in itself as to what is the true rule of damages in such cases, in this case alone its decision involves the amount of $4425.29.

1. The usual and ordinary rule of damages in the case of a refusal of a vendee to receive personal property sold to him, when the vendor has not kept the property for the vendee, but has disposed of the same, is the difference between the contract price and the market price on the day of the breach at the place of delivery. (*Chitty on Cont.* 430, 431. *Dana v. Fiedler,* 12 *N. Y. Rep.* 40. *Hamilton* v. *McPherson,* 28 *id.* 76.) This is the only rule ever established in such cases, and to it there are but two exceptions that have been allowed from the supposed necessity of the case : (1.) Where

there is *no market price* at the place of delivery, then you are allowed to prove the price at the *nearest market* and calculate the market price at the place of delivery from that. (2.) In cases where the property sold is *perishable,* and in some other cases (hereafter more particularly stated) under certain regulations and notice to the vendee, the vendor is permitted to sell the property *as the property of the vendee,* and recover of the vendee the difference between the contract price and the *net* avails of such sale. The plaintiffs have recovered under the second exception, but in order to warrant such recovery or the affirmance thereof, the court should see that the plaintiffs bring their case *clearly* within the exception. Such is the uniform rule. If a party claims under an exception to any *uniform, well established* rule, he must bring his case clearly within the exception. In all doubtful cases the rule will prevail.

2. The right claimed by the plaintiffs to sell the property of the defendants, or rather the right of the vendor to sell the property of the vendee, as his quasi agent, was first established in cases of perishable property ; afterwards it was extended to other cases. But the only ground on which it has ever been sustained, is that the vendor may get the advantage *of his lien on the property for the purchase money,* and as the court says in *Sands* v. *Taylor,* (5 *John.* 409,) " The defendants being bound by the contract to receive and pay for the whole cargo, and having refused to do either, what were the plaintiffs to do ? The article was perishable, and the interest of all parties required that the most should be made of it. Nothing, therefore, is more reasonable than that the plaintiffs, who were not bound to store or purchase the wheat, should be permitted to sell it at the best price that could be obtained." And in all cases where the property is not perishable, the only ground we find stated in the books is stated in *McLean* v. *Dunn,* (4 *Bing.* 728,) where the court says, speaking of a sale, "but if articles are not perishable, price is." Hence, as any implied agency must be restricted

Lewis *v.* Greider.

closely to the objects for which it is allowed and authorized (as it is against the will of the principal,) any sale under this exception from the general rule can only be authorized when it is so made as to accomplish the objects of the agency in such case, viz : to protect and make available the lien of the vendor for purchase money, by allowing him to sell and realize, and thus avoid any loss either from the perishable nature of the property, or the possible, if not probable, decrease in price. We therefore submit, that in case any vendor elect to sell the property of his vendee for the purpose of realizing from his lien thereon for the purchase money, he must do so by an immediate sale, or a sale as soon as it can be made, of the property in the usual mode in the market where it was to be delivered, and thus realize immediately the best market price. After he has given the proper notice to the vendee of his intention to sell, and thus elected to realize, he must proceed forthwith to do so, according to his notice, and the vendor is not at liberty for any reason (if there is any market at the place of delivery, as there was in this case,) to exercise any discretion, either in delaying the sale or, much less, in transporting the grain to any distant place under the belief that a better price might thus be obtained. In short, all the exception amounts to, and all the law allows, is that the vendor, instead of recovering at the trial the difference between the contract price and the market price, as shown by the opinion of witnesses, is allowed to recover the difference between the contract price and the market price, as proven by an actual trial or sale of the identical article in market at the place of delivery, and on the day of the breach or election of the vendor, or as soon thereafter as was practicable. It is thus the application of the ordinary rule, with the substitution of an actual trial as proof of market value instead of the ordinary mode by the opinion of witnesses. Again, at the time of the sale, (while the action is pending,) although the vendor claims to sell as agent, yet it is then undetermined whether he is selling as agent or principal. In this case, at the time of the

sale it was not decided whether the contract was for 3000 or 5000 bushels. If the first, the plaintiffs sold as principals; if the latter, as agents. The sale is of property, the title to which is in controversy under a claim as to title, which claim, is afterwards decided to be well founded. These being the circumstances under which the sale is made, the limits of the implied agency should be so fixed as to preserve the rights of all parties. As long as the suit is pending the defendants will not and cannot acknowledge that *they own* all the grain, and hence they do not consent or authorize any thing. So that all authority, as we have said before, comes from the *necessities* of the case in order to protect the assumed rights of the vendor, afterwards decided to be real. As to the vendor, he claims to sell as agent, but if the suit should be decided against him he will really have sold as principal and owner of the grain. A sale under such circumstances, should be so conducted as to preserve the *rights of each party* equally. If conducted as we have claimed, then the vendor will obtain all *his legal rights* with as little violation of the rights of the vendee as may be. If the vendor be allowed to exercise *his discretion* as to *when* to sell as well as *where* to sell, then, although he sells as an implied agent, he exercises all the rights and powers of *principal*. The vendor therefore loses nothing whichever way the suit is afterwards decided, as in making the sale, although he claims to sell as an *implied* agent, he really exercises over the grain, all the rights and powers of principal, to the injury of the rights of the vendee, (as afterwards decided,) as we shall hereafter show.

A short review of the decisions will show that this view of the case is sustained. (The counsel here reviewed and commented on the following authorities: *McLean* v. *Dunn,* 4 *Bing.* 728; 3 *Par. on Cont.* 209; *Girard* v. *Tygart,* 5 *Serg. & R.* 32; *Buffington* v. *Quantine,* 15 *Penn. R.* 310; *Sands* v. *Taylor,* 5 *John.* 395; *Bement* v. *Smith,* 15 *Wend.* 493; *Crooks* v. *Moore,* 1 *Sandf.* 297; *Pollen* v. *LeRoy,* 30 *N. Y. Rep.* 551.) From this brief review of the authorities, it is

Lewis *v.* Greider.

submitted that it is established and appears, 1st. That each case shows that the sale in that case was at the place of delivery, and as soon as might be after notice of election. 2d. That in every case but one or two, the notices of sale specified *the time and place of sale*, and several of the cases hold that to be absolutely necessary. 3d. That the only foundation on which this right of sale rests, is that the vendee may realize from his lien for purchase price, in order that he may not lose the value of his lien by the loss of the property, if it be perishable, or, if it be not perishable, then by its depreciation in price. 4th. That in no case is there any proof of damages except this resale, or no proof that shows that the resale was for less than the market price. 5th. That the proof of resale, and the avails thereof, is only a mode of proving the actual damages, and that either party is at liberty to give any more just evidence of damages, and in such case the court, or jury, should adopt that. And we say, inferentially, it is equally and clearly established by the uniform practice, as evidenced *in every case in the books.* 6th. That such resale must be *at the place of delivery, and as soon as may be after due notice of intention to sell.* 7th. That such sale is *but a way of ascertaining* the market value on the day of the breach, at the place of delivery, as decided in *Pollen* v. *LeRoy,* (30 *N. Y. Rep.* 551,) and unless so conducted as to ascertain that, it is not warranted as a sale for the vendee, but becomes a sale as owner, and the vendor thereby rescinds the contract, and can only recover damages according to the ordinary rule. 8th. That the sale must be made by the vendor *as agent*, and not as *principal.*

3. The sale made by the plaintiffs in the case at bar, was not in accordance with the rules thus established, because there was no notice of the time and place of sale. (*Greaves* v. *Ashlin,* 6 *Modern,* 162. *McEchron* v. *Randles,* 34 *Barb.* 301. *Mallory* v. *Lord,* 29 *id.* 454.)

4. The sale made by the plaintiffs, as stated in the facts found, is entirely inconsistent with the rules established to

govern such resales, as hereinbefore stated, because the sale made was not within a reasonable time after the notice, and was made at a place far distant from the place of delivery. The case shows that there was a market at the place of delivery on the day of the breach, (viz. $1.90,) and although the case states that the market was dull, and the plaintiffs could not make sales *favorable, in their opinion,* yet that was no excuse to them. The case also shows that they had in their hands over $1496 over and above the price of the 724 bushels of grain delivered and interest, so that there being less than 4000 bushels on hand, the plaintiffs could have sold the grain at 35 cents below the contract price, or 25 cents below the market price, and realized all due them *on the contract.* They could at least have done this, on a very dull market, to enforce their lien for purchase money, which is the only ground for the resale. They could have made the sale at the place of delivery, soon after the breach, with perfect safety to themselves. Hence, there was no excuse for delay. But by removing the property to New York, and selling it there, the plaintiffs clearly exercised ownership over the property not consistent with the rights of the defendants, and not authorized by their quasi agency, and hence they thus *rescinded* their contract, and can only recover damages according to the ordinary rule. (1st.) No case can be found in the books in which any *resale* was ever made elsewhere than at the place of delivery, and hence the sale in this case was not according to usage or custom of trade. For this reason, according to all the authorities, it is void. (2d.) By the notice given, the defendant had no right to expect that a sale would be made at any other time than soon after *the notice,* and much less at any other place. Knowing the market, he may have concluded to let them sell, as he would still have his rights in the suit, and, if beaten, he knew what the damages would be. Hence, the damages recovered cannot be sustained, as it was not expected by the parties at the time of the breach, and they do not necessarily

Lewis *v.* Greider.

arise therefrom. (3d.) At any time while the plaintiffs held the barley, the defendants had the right to come and take it at the place of delivery, on payment of the balance of the purchase money. This right was entirely destroyed by the plaintiffs removing and transporting the property to New York city, especially without giving any notice of it to the defendants. Hence, this removal was entirely unauthorized. (4th.) If a vendor can exercise his discretion, not only when to sell but also *where* to sell, and the vendee is bound as long as he exercises *good faith;* if, as in this case, he can transport it to New York city, and sell two months after, why can he not transport it to England, or to California, or India, as long as he thinks he can do better thus ? i. e. exercise good faith. Where is the end to this power to dispose of the property of another without notice or knowledge on his part ? And what becomes of the rights of the vendee ? We submit this cannot be. The true rule is the one claimed by us. (5th.) The plaintiffs sold the grain, *in fact,* as *their own,* and not as agents for the defendant. And hence it was a clear conversion and rescission of the contract.

5. This question as to this sale not being authorized, or a legal measure of damages, was raised on the trial, and below. (1st.) By exception to the testimony about the sale in New York. (2d.) By objection to the same kind of testimony. (3d.) By objection to Van Vleet's testimony on the same point. (4th.) By the decision of the referee refusing to nonsuit the plaintiffs for reasons stated, especially for third cause stated ; and lastly, by (5th.) The exception of the defendant to the second conclusion of law of the referee, which finds that the notice, &c. " was sufficient in law to authorize *the sale made by them."* It is true, in the court below, the principal reason given and argument was, that there was no notice of time or place of sale, but the exceptions and objections, as will be seen, were to the whole matter, and bring up the whole matter.

But even if the argument or reason urged here was not

urged below, that is no objection. The case shows that the facts, with regard to the sale and notice, found by the referee, were just as stated by the plaintiffs themselves, and that, at least, as far as regards them, if raised below, they could not have proved any thing to obviate the argument raised on appeal. The court have the facts as to the sale and notice of the same, and market price, just as agreed upon by the parties, or as sworn to by the plaintiffs themselves. We raised the questions all below, but even if it be admitted that here we urge another argument in support of our position, to that there can be no objection. The court thus having the *facts as they are,* which cannot be altered, will apply the law thereto, and, as we submit, must, for the reasons hereinbefore stated, reverse the judgment and vacate the reference.

*Folger & Mason,* for the respondents. I. John Coryell had no such interest in the subject matter of the action, as makes it necessary that he be joined in it as a plaintiff, or otherwise. Even if the facts made Coryell a partner, he was a *dormant partner.* And a dormant partner need not be joined in an action as plaintiff. (*Alsop* v. *Caines,* 10 *John.* 396. 399. *Clark* v. *Miller,* 4 *Wend.* 628. *Clarkson* v. *Carter,* 3 *Cowen,* 84.) But the facts of the case do not warrant the legal conclusion that he was a copartner with the plaintiffs in this transaction. The relative condition of the parties does not depend upon the words used, but upon the entire scope of the arrangement between them. (*Loomis* v. *Marshall,* 12 *Conn. R.* 69. *Turner* v. *Bissell,* 14 *Pick.* 192.) The whole scope of the arrangement between the plaintiffs and Coryell was this : that he should buy barley for them ; that they were to be owners, controllers and disposers of it ; that he was to have no ownership in it, nor any control or voice in the management of it. He was to be paid for buying it. That was all. And one half of the profits was fixed upon as the standard by which was to be determined what were the wages of his labor. His entire interest was compensation for labor.

Lewis *v.* Greider.

Such a state of facts does not make persons copartners *inter sese*, nor as to third persons. (*Conklin* v. *Barton*, 43 *Barb.* 435. *Story on Partnership*, 2d ed. p. 50, §§ 32, 33.) In such case, it is well settled that the contingent participant in anticipated, or the certain sharer in accrued, profits, is not to be held as a partner. (*Mair* v. *Glanure*, 4 *M. & S.* 240. *Dey* v. *Boswell*, 1 *Camp.* 329. *Wish* v. *Small, Id.* 331. *Dunham* v. *Rogers*, 1 *Barr.* 255. *Ross* v. *Drinker*, 2 *Hall*, 415. *Ambler* v. *Bradley*, 1 *Verm.* 119. *Muzzy* v. *Whitney*, 10 *John.* 226. *Mumford* v. *Nicoll*, 20 *id.* 171.) It is the intention of the parties which is to be sought for. (*Story on Part.* § 36.) Participation in the profits is, at best, but presumptive of the existence of a copartnership. The presumption may be repelled, and the participation be shown to to be merely a compensation. (*Story*, § 41, and see § 48. *Burckle* v. *Eckart*, 1 *Denio*, 337. *S. C.*, 3 *N. Y. Rep.* 132. *Vandenburgh* v. *Hull*, 20 *Wend.* 70.) In order to Coryell being a partner, he must have an interest in the stock, with the right of control, and must be liable to losses. (*Ogden* v. *Astor*, 4 *Sandf.* 311, 321. 43 *Barb.* above cited.) Again, The rule is varied when the parties are plaintiffs seeking to enforce a liability, rather than defendants against whom a liability is sought to be enforced. (*Burckle* v. *Eckart*, 3 *N. Y. Rep.* 142. *Shankland, J. dissenting opinion and cases there cited by him.*) And note, too. The plaintiffs, by the agreement with Coryell, *had the sole right to dispose of the barley.* Hence, they only could be the vendors. They only could sell and *contract* to sell; with them only could the contract be made, and they being the sole parties to it of the one part, could alone bring the suit to enforce it against the party of the other part. But it is at times claimed that, though Coryell is not a partner, yet he had some sort of interest in the subject matter of the action, and so by force of the 111th section of the Code of Procedure, the action must be prosecuted in his name jointly with those of the plaintiffs. But if it should be held that Coryell is a *real*

*party in interest,* still it is not necessary that he should be a party to the action. For the contract certainly was not made by the defendants with him, nor with him and others. The contract was made by the defendants with the plaintiffs, Lewis & Cobb, and with none other. If Lewis & Cobb made that contract otherwise than as the sole parties of the one part to it, otherwise than as alone interested in it, and as alone to be benefited by it on that side, they must, in the language of the 113th section of the Code of Procedure, have made it " in their name, *for the benefit of another*;" to wit, Coryell. They, Lewis & Cobb, the plaintiffs in this action, are the " persons with whom, or in whose name the contract is made for the benefit of another." And if so, then by force of the 113th section of the Code, they are the " trustees of an express trust," within the meaning of the 113th section, and by its authority " may sue without joining with them the person for whose benefit the action is prosecuted." In this wise, then, it was not necessary that Coryell should be joined as a plaintiff in the action. If it be said that one partner cannot be a trustee of an express trust for another partner, it has already been shown that Coryell is not a partner. And, moreover, it is not a universal rule that one partner may not be the trustee of an express trust for another partner. The terms of the contract between them may make the one a trustee for the other. And such are the terms of the contract in this case. If, under the agreement in this case, Coryell is a partner with the plaintiffs, then, by the same agreement, are they to have sole control, to manage alone, to sell alone, to receive avails alone, without his intervention, as his trustee, so far as his interest is concerned. (*And see North* v. *Bloss,* 30 *N. Y. Rep.* 374; *Code of Procedure,* § 119; *Hurlbut* v. *Post,* 1 *Bosw.* 36.) Again, if there would be any thing in the position that Coryell is the real party in interest, and should have been joined in the action, the defendants have waived the objection by pleading a counter-claim in favor of the

Lewis *v.* Greider.

defendants and against the plaintiffs, Lewis & Cobb, on the contract in suit. (*Secor* v. *Law,* 9 *Bosw.* 163, 185.)

II. At the close of the plaintiffs' case, the defendants moved to dismiss the complaint, for this, with other reasons, that " no money was paid, or no part of the 2000 bushels of grain last contracted for, had been accepted by the defendants, and as to the 3000 bushels the defendants had offered to fulfill." In other words, the defendants claim that the contract of the parties, so far as the amount of grain over the 3000 bushels is concerned, is within the statute of frauds, and therefore void. This position is tenable only upon the assumption that there was no memorandum in writing of the agreement; that there was no part of the purchase money paid, and that there was no part of the grain delivered to the defendants. (2 *R. S.* 136, § 3.) It is true that there was no memorandum of the agreement, in writing. But it is not true that the buyer did not accept and receive a part of the grain over and above the 3000 bushels in store when the agreement was made. Nor is it true, that the buyer did not at the time pay some part of the purchase money. In the first place, the fallacy of the defendants is in supposing that there was one bargain for the 3000 bushels, and another bargain for the rest of the grain. It was all one agreement. The referee has found that the agreement of the parties was as it is set forth in the complaint. At page 18, case, *folio* 68, the referee says that the plaintiffs insist that the entire amount of 5000 bushels was embraced in the contract of that day. At page 21, case, *folio* 82, he says : " Upon the whole, my opinion is, that the weight of evidence is in favor of the contract, as stated by the plaintiffs." At page 25, *folio* 98, of the case, he finds that the defendants made with the plaintiffs the agreement for the purchase and sale of barley in the complaint stated and set forth. The contract is stated by the plaintiff Cobb, at page 32, of case, *folios* 127, 129, 133, 134. At the last folio he says that the payment of the money

was about the last thing. And so at *folio* 136, "all our conversation was one, and *after we got through with it,* he paid me $3000." And in the findings, as settled by the referee, he again states that the agreement was as is set forth in the complaint. There was then but one bargain between the parties certainly for 3000 bushels of barley, and contingently for as much more as the plaintiffs could obtain, up to the limit of 5000 bushels in the whole. Upon this bargain, $3000 were paid by the buyers, the defendants, at the time it was made. Upon this bargain, 700 bushels and over, part of the goods, were accepted and received by the buyer. (*McKnight* v. *Dunlop,* 1 *Seld.* 537.) But even if we concede that there were two bargains, one for the 3000 bushels, and one for all over that amount, still the second bargain is not liable to the objection of the defendants. (1.) There was no payment of money, until after both bargains had been concluded. Then, the buyer paid some part of the purchase money, and paid it on both bargains, as much on one as the other, as much on the last as on the first. (2.) The grain accepted and received by the buyer was as much a part of the barley bought and stored after the agreement, as it was of the 3000 bushels which was at the time of the bargain in store. The testimony shows that all the barley was in the storehouse before the 5th of January, 1865, and that it was all stored together. And it was from this barley, all stored together, lying in the same bins, that the part accepted and received by the buyer was taken. So that, taken as one bargain, or as two bargains, the buyer paid upon the one or upon each, a part of the purchase money, and accepted and received upon the one or upon each, a part of the goods sold. And in this view, the defendants did not offer to fulfill ; for they offered to furnish drafts, only on a contract for 3000 bushels. The plaintiffs waived their right to cash, only on a contract for the 3000 bushels, and for the additional quantity purchased by the plaintiffs for the defendants. Even if the defendants had been right in their position, that they con-

tracted only for 3000 bushels, still they did not offer to fulfill that contract, for payment of cash alone would have done that. And *quœre.* If the transaction between the parties as to so much of the barley as was not already owned by the plaintiffs was another contract, can it be said to be within the statute of frauds ? for the plaintiffs *were not bound to sell,* although the defendants *were bound to buy.* The plaintiffs were only contingently bound to attempt to buy, and, if successful, to deliver to the defendants the result of the attempt.

III. The plaintiffs had a right, on the failure of the defendants to fulfill the contract on their part, to notify them of a purpose to sell the barley, and had a right then to sell the same, in good faith and in the best manner. And the defendants are liable to the plaintiffs for any deficiency arising upon the sale from the contract price of the barley, with interest thereon and expenses incurred. The finding of the referee is, that the defendants made a breach of their contract, and failed to perform ; that the plaintiffs thereupon gave notice to the defendants that they should sell the barley on hand to the best advantage, and hold the defendants responsible for the deficiency, if any. The referee further finds that the plaintiffs sold the same for the best price that could be obtained, and made the sale in good faith, and that there was a deficiency upon that sale. The contract, being that which is set out in the complaint, the defendants did not fulfill. The plaintiffs then had a right to damages from the defendants for their failure to perform.

It remains but to ascertain the rule by which those damages shall be fixed and awarded. The rule is as follows : Where the vendee is sued for non-performance of his contract, the vendor may show a resale of the goods while in his possession, and charge the vendee with the difference between the contract price and the price realized at the sale. (*Sedgwick on Dam.* 281, *and cases there cited. Chitty on Cont.* 430, 431. *Bogart* v. *O'Regan,* 1 *E. D. Smith,* 590.

1 *Pars. on Cont.* 446 ; *citing* 4 *Bing.* 722 ; 4 *Esp.* 251 ;
5 *S. & R.* 19 ; 5 *John.* 395 ; 1 *Sandf.* 279 ; 4 *Barb.* 564.)
The defendants had completely refused to carry out their
bagain, and so the plaintiffs had a right to resell and charge
the defendants with the loss. (*Sands* v. *Taylor,* 5 *John.*
395.)   The plaintiffs had the right to have from the defend-
ants the money which the defendants had agreed to pay.
The defendants had no right to impose upon the plaintiffs,
the further toil and trouble of caring for and selling again the
barley.   The plaintiffs might have left it in the storehouse,
ready for delivery when called for, and have sued for and
recovered the contract price. (*Sedgwick on Dam. above
cited.*)   What the plaintiffs did in this case was so much
more than their legal duty to the defendants, but still what
they had a right to do, to save the property from loss and
waste, and to guard themselves from a possible inability on
the part of the defendants to meet the plaintiffs' just de-
mand against them.   And the only question is did the
plaintiffs act in good faith ?   Their good faith is expressly
found by the referee.   The defendants had completely refused
to carry out their contract.   This gave the plaintiffs a right
to resell and charge the defendants with the loss or differ-
ence. (*Sands* v. *Taylor,* 5 *John.* 395.)   It is well to note
the reason given for the decision in the case last cited.   The
decision is put upon the ground : 1st, that, by the contract
and the part execution of it, the title to the property sold
was changed, and the vendees (the defendants) became the
owners of it ; 2d, that, by the refusal of the vendees, (the de-
fendants,) to receive the property, the vendors, (the plaintiffs,)
became the trustees or agents for the vendees, and must
either abandon the property to waste, or must proceed to
sell it.   The point we wish to press is, that the vendees
(the defendants) were still holden to the contract, and the
vendors (the plaintiffs) had still the right to hold them ;
that the property was the property of the vendees, *and that
the vendors were, by operation of law, the agents of the*

*vendees to manage and dispose of it.* · (*See pages* 405, 6 *of case last cited.*)    As is remarked in *Healy* v. *Utly,* (1 *Cowen,* 353,) " the plaintiffs were *of necessity* compelled to dispose of it." Being then the agents or trustees of the defendants, it matters not what the plaintiffs did with the barley, so long as it was done in good faith towards the defendants, honestly seeking the advantage of the defendants. In all their dealings with the barley after the defendants' refusal to perform, the plaintiffs acted only as the agents or trustees of the defendants. They did not change or affect their character as vendors, and still as such had and have the right to recover the contract price of the goods sold.

The rule is not as the defendants contend, the difference between the contract price and market price on the day of the failure to perform, or on any other day. The plaintiffs have no concern in the market price. The plaintiffs had the right to have from the defendants the money which they had agreed to pay ; and this merely upon the delivery of the barley. The refusal of the defendants to receive and pay the contract price created new relations between the parties, and gave the plaintiffs the option of further and different action. This option they took. What the plaintiffs did then was so much more than their legal duty to the defendants as *vendors* to them. It was done in their new relation of *trustees or agents,* a relation created by the necessity of the case. And the only inquiry is, did they, as such trustees or agents, act in good faith ? This rule has been often recognized in the courts of this state. (*Crooks* v. *Moore,* 1 *Sandf.* 297. *Pollen* v. *Le Roy,* 30 *N. Y. Rep.* 549, *and cases cited in these authorities.*) But conceding that the rule is as stated by the plaintiffs, the defendants claim that the resale of the barley by the plaintiffs was irregular, in that there was *no notice of the time and place of sale.* To which the plaintiffs reply : (1.) That it matters not. The plaintiffs were then acting as agents of the defendants, and the sole inquiry is, did they act in good faith, and with the

honest intent of benefiting the defendants. (2.) The law does not require that, in such a case, notice of the time and place shall be given. (*Crooks* v. *Moore, above cited. Pollen* v. *Le Roy, above cited, p.* 556. *Bogart* v. *O'Regan,* 1 *E. D. Smith,* 590.) Nor does the fact that the barley was sent to New York city for sale, put the plaintiffs in the wrong. (*Jackson* v. *Covert,* 5 *Wend.* 139. *Kingman* v. *Hotaling,.* 25 *id.* 423.) The plaintiffs, if acting in good faith, could seek what was in their judgment the best market for the defendants. The case of *Mallory* v. *Lord,* 29 *Barb.* 454,) upon which the defendants rely, is easily distinguishable from this. That was not a case *of a vendor in possession, holding the property after a failure by the vendee to perform,* but it was a *case of a conditional sale,* where the title to the property had never passed, where the vendor was the owner still of the property ; and the decision of the court in that case, while recognizing the existence of the rule above stated, held that it did not apply to the facts before it. The defendants also rely upon the case of *McEachron* v. *Randles,* (34 *Barb.* 301.) But it is sufficient to say of that case, that it is noticed and commented upon, in the case above cited in the Court of Appeals, (*Pollen* v. *Le Roy,*) and is disapproved. And indeed, in *McEachron* v. *Randles,* the resale was without any notice, or any intimation of an intention to sell. And is not all the notice that the law requires this ; that the vendor shall explicitly inform the vendee, that he means to seek his remedy *pro tanto,* by a resale of the property. For in *Crooks* v. *Moore* above cited, though the notice specified the time, yet the sale was not made until a month after that time. So that notice of time in that case would mislead rather than aid. Yet the court held the sale good though based upon that notice. And that decision is approved of by the Court of Appeals, in *Pollen* v. *Le Roy.* Nor is it necessary, that the sale should be in any specific way, or that notice of that specific way should be given. If the best, and usual method is by public auction,

that method may be followed.  If by the employment of a broker, that method may be employed.  (*Pollen* v. *Le Roy, above cited, p.* 557.)

So far, we have gone on the assumption that this point is fairly in the case.  But it is submitted that the defendants are not in a position to raise this question, in this court, on appeal.  The defendants do not, in the progress of the trial, any where make a specific objection which meets the point now raised.  The objections are all of the most general character  Hence they are not available here.  (*Requa* v. *Holmes*, 16 *N. Y. Rep.* 193, 201.  *Day* v. *Roth*, 18 *id.* 448, 451.)  But at all events, the defendants cannot here insist upon greater scope to the point raised by them, than is within the terms of the objection as stated and argued before the referee.  The point made before the referee, or in the language of the referee, " the precise objection presented by the defendants was, that neither the time nor place of sale was contained in the notice given, and that both were necessary."  The cases hereinbefore cited, show it is submitted, that notice, specifying time and place is not necessary.  That all that is requisite, is such a notification as will explicitly apprise the vendees of the purpose of the vendors to resell the property, and to hold the vendees liable for a deficiency.  And the reason why no more is necessary is evident, and it is that the control of the whole matter is in the hand of the vendees.  They have but to perform their contract, they have but to pay what they have agreed to pay, and they may take the property and sell it as, and when, and where they like.  If it is not so sold, they are the party in the blame.  And it is noticeable, that this matter of the resale, and of the notice of the time and place of it, was not the point in difference and dispute between the parties.  The defendants deliberately repudiated their contract and flatly refused to carry it out.  They took their stand there.  They made no objection when notice of intention to sell was given, of want

of particularity. This objection was not started until after suit was commenced to enforce the repudiated contract.

IV. If it is established by the authorities that a vendor in possession of the residue of the goods sold, may on the failure of the vendee to receive that residue and to pay the contract price, resell the same on notice of his intention so to do, then the plaintiffs were correct in their action with this barley. For they gave the defendants explicit notice of such intention. If it is established by the authorities that from that time they were the agents or trustees of the defendants, and that all that could be legally required of them was to act in good faith towards the defendants, then they have shown themselves within the legal rules. For they did act in relation to this barley in good faith. They made effort to sell the barley at the place of making the contract. Failing in this, they shipped it to New York, and sold it there, in the usual course of the trade, by a broker, for the best price that could be obtained. It is to be noted, too, that it was in the power of the defendants, at any time after the notice was given by the plaintiffs, and before the sale, to have possessed themselves of the barley by paying the contract price. So that all results are chargeable directly to them. Theirs was the breach of the contract; theirs was the refusal to perform; theirs was the neglect again to fulfill after the notification from the plaintiffs of intention to sell, and — theirs should be the loss. To test this, consider what the plaintiffs might legally have done. They might have let the barley lie until this day, when it would have become utterly spoiled, and still have recovered of the defendants the whole contract price. But they did better for the defendants than this. They apprised them distinctly, and at once, that they should hold them to their contract, that they should sell the barley on the best terms. They did so sell it, and thus the defendants are liable, only for a balance of the contract price, instead of the whole of it.

*McDonald,* in reply.   I.  The counsel for the respondents claims that Coryell is only a *dormant* partner, and hence should not have been joined, citing several cases — all before the enactment of the Code.   We admit that before the Code such was the law, but since then the law has been that dormant partners must be joined as *parties plaintiff; (see* 4 *Duer,* 416 ;) hence the authorities (being before Code) are not in point.   Nor will it do to claim that Cobb & Lewis were trustees of an express trust.   In this case there is no such relation as is contemplated by law.   Hence, for reasons before stated, Coryell should have been joined as party plaintiff, and as he was not, the judgment should have been reversed.

II.  As to the question submitted in our second point, as to the mistake of the referee with regard to the evidence in the case, it may be answered that by an examination of the books it will appear that the word *prime* was *written* in afterwards.   This may so seem, but *how long* afterwards ?   On examination it will also appear that another portion of the memorandum was apparently written at the same time with word " prime."   In fact we claim that at the same time or the same evening the defendant Greider, on looking over his memorandum, saw that he had omitted some things and put them in.   But the error is this, that the referee by *mistake* has passed upon the case on the ground there was no such *word there,* not that it was written in afterwards. In this he admits by his certificate he was mistaken.   Hence, as we have said before, we have not had a *fair trial* on the evidence, but only on a portion of the evidence.   In cases where testimony is rejected that is proper, or even in cases where improper evidence is admitted, the court will always reverse, unless it is a very clear case that the evidence could not in *any point of view* have had any effect or influence.   (*Weber* v. *Kingsland,* 8 *Bosw.* 515, 445, 446.   *Worrall* v. *Parmlee,* 1 *Comst.* 419.   *The People* v. *Wiley,* 3 *Hill,* 194, 214.) In this case the omission to consider the evidence did, by the

confession of the referee, in his opinion, have an effect. Nor can the plaintiffs now raise the point that the word prime was written in afterwards, as he did not raise it below; and had he done so the plaintiff could have produced evidence to explain it. The fact is that, as we claim, and as the court must see, the defendant has not had a *fair trial on all the legal testimony,* and that without any fault of his, and it may be without any fault on the part of any body, simply the oversight of the referee. Clearly, from the authorities, the defendant should have a *fair* trial on the consideration *of all* the evidence, and now should• have a new trial. Just what should be the decree as to costs is not so clear, although we claim it should be the usual one, to abide event.

III. On the third point, as to what is the true rule of damages, it may be that according *to the facts found* by the referee, the defendant would not be entitled to any verdict under the decision of this court, in *Monroe* v. *Reynolds,* (47 *Barb.* 575 ;) but that does not affect the reasoning in the points to show that the defendant should have no judgment against him. On a new trial, (if one is granted,) the facts may be found as sworn to by the defendant, and in such case he must have a verdict. In support of the position of the counsel for the respondents, in his third point he cites only one authority on the main question that we have not already considered, viz : *Bogart* v. *O'Regan,* (1 *E. D. Smith,* 590.) On examination of that case it will be seen that it comes directly within the rule claimed by us, including all that is *obiter* in the opinion. In that case there was an immediate sale at the place of delivery, and what is more, as the court says, (*p.* 592,) "an express authority conferred to sell the goods." Hence the plaintiffs take nothing by this case.

IV. In answer to the objection that our third point was not fairly raised below, and hence cannot be considered here, in addition to the statements in our former points we would submit : That the very cases (16 *N. Y. Rep.* 183. 18 *id.* 448) cited by the defendant show the contrary. The counsel for the re-.

spondents quotes from the *opinion* of the referee to show what the exception of the defendant on this point was. As will be seen by the references made to the *case as settled* in our former points, that was not the precise objection raised. The objection raised was, that the testimony of sales in New York was *immaterial evidence* and improper. On the motion for nonsuit the point was, "because no legal damages had been shown;" and again by the referee's second finding of law, and the defendant's exception thereto. The statement by the referee in his opinion arises from the fact that the *main reason urged below* was that no notice of time or place was given. At that time the decision of *Pollen* v. *Le Roy*, (30 *N. Y. Rep.*) was not published, and the decision of general terms, 29 and 34 *Barb.* seemed strong enough to rely upon, and hence the attorney for the defendants did not strongly urge any other. Hence the statement of the referee that such was the point. We submit that it cannot be that because counsel does not urge an additional or any reason below, he cannot urge it above. Were that so, there could be no advance in argument. The true rule is that if you have raised your question, you can argue it above as you like, as you did below, or differently. In *Requa* v. *Holmes*, (16 *N. Y. Rep.* 193–212,) there arose two objections; 1st, to the admission of evidence. The appellant tried to make the objection *particular* on appeal where it had been *general* below. The court says that a part of it was proper. Hence, as the objection was general it did not avail. This no one doubts. But further on in the case there is another claim that an exception was too general, and that exception is in all respects like this. But the court as to that say: "The exception was as specific as the ruling or charge. It was unnecessary to state *the reasons* why the charge was, or was supposed to be erroneous." So in this case, the exception was as specific as the ruling. It is not competent to refer to the *opinion* to find out what the exception was, only in *cases of doubt.* The *case as settled* shows and is the best and,

unless in cases of doubt, the *only* evidence of what took place and was held—what was excepted to, and how it was excepted to below. We therefore refer to the case as settled. That shows that the evidence as to sale in New York was several' times excepted to, not because there was no notice of time or place of sale, but because it was incompetent. Hence we have the right to now urge *any reason* why such testimony should not have been admitted. It will not be claimed that the evidence of sale in New York is competent except as a rule of damages. It could not possibly be *any evidence* of damages at Lodi Landing, the place of delivery. Hence, unless it is proper as the *rule* of damages, it is not proper for any purpose, and should not have been admitted. This is the point we now raise.

Again, the referee rules and decides, " *that the notice given* by the defendant to the plaintiffs of their intention as to the sale of the grain and the application of the proceeds as above set forth, was sufficient in law *to authorize the sale made by them.*" Now we understand this court to have decided, at the last term, in the case of *Leffler* v. *Fields,* that the defeated party has the right (within the ten days after the delivery of report allowed by the Code) to take *any exception* to the findings of law by the referee that he would have had in case of trial by jury the right to take, had *the same proposition* been included in the charge of the judge to the jury. Now, supposing on a trial by jury, the judge had charged in the words above quoted and the defendants had excepted, would there be any doubt that the question now submitted was fairly raised, or, in the words of the court in *Requa* v. *Holmes,* that "the exception was as specific as the ruling or charge?" &c. (*Id. p.* 201.) We submit not. In the case of *Day* v. *Roth,* (18 *N. Y. Rep.* 448,) a *series* of letters were offered in evidence. There was a *general* objection and exception below. The court say that *at least one* of the letters was not only competent but *important* evidence, and the exception being to all the letters, was not well taken. This

Lewis *v.* Greider.

is undoubtedly the law. But in this case, if we are right, the evidence is *entirely incompetent* for any purpose, and if that be so, the exception is well taken, as decided by all the cases. This view is sustained. also by *Collyer* v. *Collins*, (17 *Abb.* 467 ;) *Spaulding* v. *Hallenbeck*, (35 *N. Y. Rep.* 204.) But even if, for the sake of the argument, it be admitted that the question now raised was not specifically raised below, (which is denied,) yet it would be proper to raise it on appeal, because if raised below the plaintiffs *could not have produced any proof* to avoid the question, or alter the facts bearing upon it. That the sale was in New York will not be questioned, and as to how it was made, the witnesses of the plaintiffs tell, and there is no controversy. And, moreover, the finding of the referee that the sale was *in good faith* is as favorable to the plaintiffs as possibly could be. The contract price at Seneca lake is admitted in the case, and the reasons for the transhipment and sale at New York are explained by Cobb. These are all the facts that in any way relate to this question. · Hence we submit that even under the claim of the counsel for the plaintiffs, the point taken by him is not tenable, because had the reason been given *explicitly* below, as it is here, the plaintiffs could not have proven any different state of facts, or at least any *more favorable* to the plaintiffs than as now found by the referee and on which it is now argued. If we are right in our premises we need cite no authority, as this principle is too well established.

*By the Court,* JOHNSON, J. Upon the facts found by the referee Coryell was not a partner with the plaintiffs, in the barley purchased by him for them. He was their agent merely, depending for the measure of his compensation upon the amount of profits realized by the plaintiffs from the transaction. (3 *Kent's Com.* 33.) Even if he was interested in the amount which might be recovered in the action, he was not necessarily a party, not being part owner of the article sold. The contract was properly between the plaintiffs and the

defendants, and although Coryell was, in a certain sense, beneficially interested in the contract, the action was properly brought in the name of the plaintiffs without joining him. (*Code*, § 13.)

The refusal of the defendants either to pay the money, give security or do any other act in fulfillment of the contract, gave to the plaintiffs the right to sell the barley on the defendants' account and hold them responsible for the deficit in the price. (1 *Parsons on Cont.* 446.) And it was not necessary for the plaintiffs to give the defendants notice either of the time or place of sale. (*Pollen* v. *LeRoy*, 30 *N. Y. Rep.* 549.) They did give general notice of their intention to sell, and that was enough. The law in such a case constitutes the vendor in possession of the goods the agent of the vendee, for the purpose of such sale. As such agent he must act in good faith, and take proper measures to secure as fair and favorable a sale as possible. Probably no notice to the vendee is strictly necessary of the intention to sell, though notice of some kind, of such intention, is always a wise precaution. This notice was on the 15th of March, 1865, the day on which the defendants refused to fulfill the contract on their part. After this the plaintiffs tried, without success, to sell the barley at Geneva, and finally concluded to ship it to New York, where it was sold in the usual way, at the best price which could be obtained in the market. This shipment, as the referee finds, was in good faith, for the purpose of getting the best price which could be obtained. The defendants' counsel contends that if the plaintiffs had the right to sell at all on the defendants' account as their agents, they were restricted to the place of the delivery of the grain named in the contract, and to a time necessary for reasonable notice after the right to sell accrued. But I am of the opinion there is no such limitation to the right. Doubtless the sale should be within a reasonable time. But what would be a reasonable time might depend upon a variety of circumstances. And as to place, if the article could not

Lewis v. Greider.

readily be sold at the place of delivery fixed by the contract, or a better and more advantageous sale could be effected elsewhere, it would, I think, be the duty of the vendor to go where he could get the best price and readiest sale, not out of the usual course of trade in marketing such property. There is nothing to show that the defendants have lost any thing by the delay, or by the sale being made in the city of New York. It was sent forward as soon as navigation opened, and that course was adopted in good faith by the plaintiffs for the purpose of making the most that could be made out of the barley. These questions as to the delay in selling, and the sale having been made at an improper place, were neither of them distinctly raised upon the trial. Had they been raised there, additional evidence might have been given as to the necessity, and advantage to all parties, of delaying the sale till the opening of navigation and then sending to and selling in New York. So far as these considerations bear upon the case, these questions now first distinctly presented are of no avail and should not be considered. They can only be raised and urged here, upon the ground that the plaintiffs had no right, under any circumstances, to delay the time they did, and send the property to New York to be sold on the defendants' account. This seems to be the ground taken, and upon which the point is now urged. In this aspect it is plain that the case could not have been changed by any additional evidence, and so far, I think, it is a proper matter for consideration. But this ground, I think, is wholly untenable. It is not, as the learned referee suggests, a judicial sale, in any sense ; and it seems to me very clear that the vendor, acting as the agent of the vendee, under such circumstances, would be authorized, if not absolutely required, to sell when and where the most advantageous sale could be effected for the interests of the vendee. Of course he would not be required to go out of the ordinary course and channels of trade. But within those bounds, if he acts

in good faith, and does what he believes will be for the best interests of his principal, he should be protected.

And the ground upon which the defendants' counsel asks for the reversal of the judgment, is that the referee overlooked and failed to take into consideration a portion of the defendants' evidence. It is assumed in this point, that the referee, when the memorandum of the defendant Greider of the purchase made by him of the plaintiffs was presented, did not notice the word "prime" which had been added by way interlineation or addition to the memorandum as first made, or that if noticed at the time it had been forgotten by the referee when he came to decide the case upon the evidence; and the inference is drawn that if the referee had noticed and remembered this interlineation, when weighing the evidence, the poise, or inclination of the scales, would, or might have been, in the defendants' favor, instead of the plaintiffs'. The presumption certainly is that the referee did not overlook the terms of the memorandum, or fail to consider it as it stood at the time of the trial, in weighing the evidence to determine where the preponderance lay, on the disputed question of fact. It is for the defendants to show clearly that such an error or mistake has occurred, before he can ask the court to act upon it. I do not find in the case any satisfactory evidence whatever that there has been any such error or oversight. The only evidence is, in the opinion of the referee, where the memorandum is referred to, as containing nothing on the subject of the quality of the barley, and raising the inference that it was to be merchantable barley only. The legitimate inference from this clearly is, not that the referee had not discovered the interlineation, or had forgotten it, but that he had rejected it, as being no part of the memorandum as originally made, and only the work of an afterthought thrown in as a make-weight. Precisely how the referee viewed it is matter of conjecture only. Nor could it be expected his opinion would disclose the precise amount of force given to each circumstance, or the particles rejected in striking the

balance. It would never do to reverse judgments on grounds so uncertain and hypothetical as this. The other questions in the case are all questions of fact, upon which the finding of the referee is conclusive.

The judgment must therefore be affirmed.

