OLIVER W. BARNES, Appellant, *v.* JESSE SELIGMAN, JAMES SELIGMAN and DAVID SELIGMAN, as Executors of the Last Will and Testament of JOSEPH SELIGMAN, Deceased, and GEORGE H BROWN, Respondents.

*Contract to deliver stock — value of the stock, how determined on a breach thereof — amendment of complaint to conform to proofs, not proper when the admission of the proofs in evidence has been objected to — allegation as to the insolvency of the survivors in a suit against the representatives of deceased joint-debtor.*

Where a contract provides for the delivery of certain corporate stock, and the party obligated to deliver the same refuses to do so, the measure of damages is not what the stock would be worth to the party entitled thereto after he had procured it, but what it would cost him to procure it.

Where it appeared that the only way in which such stock could be procured was by the payment of the face value thereof into the treasury of the company, and causing it to be issued by the corporation, the party entitled thereto under the contract is entitled to recove° as damages its face value, although such stock may, in fact, be worthless.

*Kirschmann* v. *Lediard* (61 Barb., 573) distinguished.

Where the stock has a market-price, the measure of damages is determined thereby; but if it has no market-price, the damages are determined by the cost of procuring it, if it is possible to do so; and proof as to what the party entitled under his contract could sell the stock for, if it has no market-value, is immaterial. (BARRETT, J., dissenting.)

A complaint cannot be amended to conform to the facts proved, where an objection has been taken in time to the proving of the facts, because of the insufficiency of the pleading.

The rule which requires, in a suit against the legal representatives of a deceased joint-debtor, an allegation in the complaint of the insolvency of the survivors, is not limited to cases of partnership contracts. In the absence of an allegation as to the insolvency of the survivors, no action can be maintained against the representatives of the deceased joint-debtors.

APPEAL by the plaintiff from a judgment, entered, upon the report of a referee, in the office of the clerk of the county of New York, on the 19th day of May, 1886, for the sums of $2,361.51 and $2,364.02, respectively; and also from an order made at a Special Term held in the county of New York, and entered in the office of the clerk of the county of New York on May 5, 1886, granting defendants' motions for, and awarding an extra allowance of, $1,000 to the defendants Seligman. and an extra allowance of $1,000 to the defendant Brown.

*E. C. James*, for the appellant.

*Hamilton Odell*, for the defendant Brown.

*G. W. Seligman*, for the defendants Seligman.

VAN BRUNT, P. J.:

In the statement of facts upon which the legal questions which are to be discussed arose it will not be necessary to advert to but a few of those found by the referee.

This action was brought to recover $200,000, with interest from the 16th of May, 1872, as damages for the breach of a contract dated the 26th day of March, 1872, made by Joseph Seligman and George H. Brown with the plaintiff in the following language:

"Oliver W. Barnes having, by instruments bearing even date herewith, assigned and transferred to us, George H. Barnes and Joseph Seligman, all claims and demands against the New York City Central Underground Railway Company, and his title to certain subscriptions to the capital stock of said company, and also any interest he may have in a certain alleged contract made with the said company by Francis P. Byrne, and having also transferred sixty shares of stock in said company.

"Now, we, George H. Brown and Joseph Seligman, do hereby, in consideration of the premises, and of one dollar to us paid by the said Oliver W. Barnes, agree that we will, upon certain amendments to the charter of the said New York City Central Underground Railway Company, now pending before the legislature of the State of New York, becoming a law, pay or cause to be paid to the said Oliver W. Barnes his representative and assigns, the sum of twenty-seven thousand five hundred dollars in currency of the United States, being the amount of certain advances made and services rendered by the said Barnes to the said railway company. And also that we will cause to be delivered to the said Barnes or his assigns, at the time of the payment of the said money, two thousand shares of the capital stock of the said railway company, which said stock is to be full paid stock.

"And we further agree with the said Oliver W. Barnes, his representatives and assigns, that in the event of the said amendments not becoming a law at the present session of the legislature, we will either cause said money to be paid and said two thousand shares of stock delivered to the said Barnes or his assigns, or have reassigned to the said Barnes or his assigns the claims, demands and rights so assigned to us, and transfer to him or his assigns the said sixty shares of stock so transferred to us the next day after the close of the present session of the legislature of New York. And we further agree that not more than one hundred additional shares of the stock of said company shall be issued until the said payment be made and stock delivered without the consent of the said Barnes, and that so much of said one hundred shares as shall be issued shall be transferred to the said Barnes, if we do not exercise our option of paying said twenty-seven thousand five hundred dollars and delivering said two

thousand shares on the failure of the said amendments to become at law at the present session.

" And we further agree that no contract for the construction of the railway of the company shall be entered into without the consent of the said Barnes, until the said money shall be paid and the stock delivered.

" In witness whereof, we have hereunto set our hands and seals this twenty-sixth day of March, in the year one thousand eight hundred and seventy two.

" GEORGE H. BROWN.   [L. s.]

" JOSEPH SELIGMAN."   [L. s.]

Prior to and at the time of making said contract, the said plaintiff owned and had claims and demands against the New York Central Underground Railway Company, and a title to certain subscriptions to the capital stock of said company and an interest in a contract made by one Byrne, and sixty shares of the capital stock of said company. At the date of the contract only 117 shares of the capital stock of the company had been paid in or issued, of which the plaintiff held sixty-three shares. On the day of the date of the contract 100 additional shares were issued, and no further or other issues of full-paid stock were ever made. The plaintiff performed the said contract on his part to the satisfaction of said Joseph Seligman and George H. Brown, and duly transferred the property mentioned in said contract. The amendments to the charter of said company referred to in said contract did not become a law at the session of the legislature mentioned in said contract, and the said session closed and adjourned *sine die* on or about the 14th of May, 1872. Neither Brown nor Seligman either reassigned or caused to be reassigned or retransferred to the plaintiff or to any person on his behalf the claims, demands and rights assigned to them by said agreement of March 26, 1872, or have transferred to him or his assigns the said sixty shares of stock transferred to them or any part of said property, or made any offer so to do.

On the second day after the adjournment of the legislature the plaintiff demanded from Seligman and Brown the payment of the cash and delivery of the stock which said contract called for. Brown and Seligman, notwithstanding the failure of the passage of the proposed amendments to the charter, elected to keep the property

transferred to them by the plaintiff and to perform their contract with the plaintiff, and they subsequently paid to the plaintiff the sum of $27,500 mentioned on said contract. But they never delivered or offered to deliver the 2,000 shares of full paid stock mentioned in the contract.

The referee found that the plaintiff had sustained no actual damage by the failure of Brown and Seligman to deliver to him the 2,000 shares of said stock, such finding being based upon proof that the stock had no actual value. He also found that the complaint should be dismissed as to the executors of Seligman in that the action was commenced after the death of Joseph Seligman against his executors, and the complaint did not contain any allegation of the insolvency of Brown. He further found that the plaintiff was entitled to judgment against the defendant Brown for nominal damages, six cents. Upon application, orders were made granting extra allowances, and from the judgment and orders thus made this appeal is taken.

The appellant founds his appeal upon the claim that the learned referee erred in the measure of the plaintiff's damages, and this is the most important question involved. There is no dispute about the main facts of the case. The plaintiff and the defendant Brown and Seligman entered into the contract to which attention has been called. The plaintiff performed his part of the contract and assigned the property therein mentioned to Brown and Seligman as therein required to do. Brown and Seligman accepted this property, and, after it had been ascertained that the amendments which were then pending before the legislature, and referred to in the contract, had not been passed, elected to keep that property and perform the contract upon their part, and paid the plaintiff $27,500 in cash, by the contract required to be paid. They attempted to deliver to the plaintiff the stock provided for in the contract, but this stock was not of the character required by the contract to be delivered to him, namely, it was not full-paid stock; which the plaintiff, upon discovery of the fact, tendered to them back, demanding the full-paid shares to which he was entitled under the contract.

It was also proven that the stock, if it had been delivered to the plaintiff, would, probably, have been valueless in his hands for the purposes of sale; and it was in view of this fact that the referee

found that the plaintiff was only entitled to recover nominal damages. It is sought to support this finding by reference to the principles laid down in Sedgwick in discussing the measure of damages in actions on contracts, at page 200, in which it is said: "The two cardinal principles which will be found to pervade and regulate this branch of our subject are, first, that the plaintiff must show himself to have sustained damage, or, in other words, that actual compensation will only be given for actual loss; and, secondly, that the contract itself furnishes the measure of damages." And again, at page 203, it is said: "Where the contract is one by which the plaintiff is to receive, not money, but the transfer of certain property or services, then the value of the original consideration is not to be inquired into, but the value of the property or services is the measure of damages, because this is the remuneration fixed by the agreement."

So, if the contract is to pay for services in property, the value of the property is the correct measure of damage. We are also referred to the case of *McKnight* v. *Dunlop* (5 N. Y., 537), which was an action to recover damages of a vendor for the non-delivery of a quantity of malt, and it was held that the plaintiff was entitled to recover the difference between the contract-price and the market-value of the malt at the time of the refusal to deliver. The same rule was laid down in *Pollen* v. *Leroy* (30 N. Y., 549) and *Windmuller* v. *Pope* (107 id., 674).

Indeed, it is needless to cite authorities upon this proposition, because it is a rule which has long obtained and is well settled. But there is another principle which is equally well established, namely, that the law will not permit a party to realize a profit by the breach of his contract. As was said by Judge ROBINSON in *Frankinstein* v. *Thomas* (4 Daly, 258): "A contrary rule would offer to thieves and wrong-doers a premium for speculating upon a possible verdict of a jury founded upon the opinion of experts."

In the cases to which attention has been called the rule of damages was plain, because the articles which were dealt in were capable of procurement in the open market. There was no difficulty in supplying the deficiency, and no difficulty in determining what the difference of value was at the time the contract was made and at the time when it should have been fulfilled. The party

could go into the open market and indemnify himself by the purchase of the articles which were not delivered, and thus fix the amount of damages. And hence the rule which was established in the case of *Wright* v. *The Bank of the Metropolis* (110 N. Y., 237), in which it was held, where a pledgee of corporate stock converted it by an unauthorized sale thereof, and refused to purchase it upon demand, that it was the duty of the owner to replace it himself within a reasonable time, and the proper measure of damages is the highest market-price during such reasonable time; in other words, what it would cost him to procure the property so as to put himself in the same position that he was before the conversion affords the measure of damages.

The measure of damages, therefore, does not seem to be what the article would be worth to the party after he had procured it, but what it would cost him to procure it. It appears from the evidence in the case at bar that the only way in which this stock could be procured was by payment of the face value of that stock into the treasury of the company and causing it to be issued by the corporation. There was no way in which the plaintiff could get possession of the 2000 shares of stock which Brown and Seligman had agreed to give to him, except by paying $200,000 into the treasury of the company and causing the stock to be issued, and there was no other way in which Brown and Seligman could procure that stock for the purpose of carrying out the provisions of their contract. Now, under the principles to which attention has been called, the measure of damages is the amount of money which it would take the plaintiff to put himself in the condition he would have occupied had the contract been fulfilled. It is idle to say, in answer to this proposition, that the proof is that the stock would have been worthless in the hands of the plaintiff so far as money-value was concerned. That is not the question. Brown and Seligman had agreed to give Barnes, in exchange for the property which he transferred to them, 2,000 full-paid shares of said stock. If he could have gone into the market and bought this stock, clearly his damages would have been what it would have cost him to procure it. It was not necessary that he should actually purchase it. That has never been held; but the rule is that the amount of damage is measured by what it would have

cost him to replace the article which the parties contracting agreed to deliver.

Now, the proof is without dispute that it would have cost Mr. Barnes $200,000 to have procured this stock, because it could only be procured in one way. Brown and Seligman knew this when they entered into this contract; they knew this fact after there had been a failure to pass the amendments to the charter in the legislature and the legislature had adjourned, and when they had an opportunity to recede from the contract and transfer to the plaintiff the property they had received from him, and end their obligation to pay any money or deliver any stock to him. But with these facts staring them in the face they chose to confirm the contract to keep his property, and to pay him the $27,500 in cash required by the contract. And they attempted to defraud him by delivering stock under the contract which in no manner fulfilled its requirements, which, upon discovery, the plaintiff returned, demanding the full-paid stock called for by the contract. At the time when Brown and Seligman confirmed the contract they thought it was to their advantage to keep the plaintiff's property and obligate themselves to carry out the provisions of the contract upon their part. Now, can they be heard to say, after having got the plaintiff's property, " What we have agreed to give you would have been worthless if you had got it, and, therefore, we will not pay you anything for what we received from you."

It is clear that no such rule of damages can possibly prevail. Our attention is called, in support of the proposition made by the defendants, to the case of *Kirschmann* v. *Lediard* (61 Barb., 573). In that case the defendant had agreed to organize a stock company for the manufacture of articles under letters-patent owned by plaintiff; the plaintiff agreed to transfer the letters to the company when formed, and he was to receive therefor from the defendant some cash and $50,000 in the capital stock of said company. The defendant failed to organize the company and plaintiff sued for damages. The court directed a verdict for the plaintiff for $50,000, the nominal par value of said stock. This was overruled by the General Term. " The plaintiff," the court said, " was entitled to damages for a breach of the contract. The amount depended on the value of the stock after the corporation was formed, to be

proven by showing what such value would have been if the company had been formed, taking into consideration the property that was to be transferred, and also the fact that by the breach of the contract the plaintiff was released from the obligation to transfer his property. It may be that the stock would have been valuable or it may be that the damage would be only nominal."

It is apparent, upon a consideration of the facts in the case cited and those in the case at bar, that it is no authority for the proposition claimed upon the part of the defendant. In the case cited nothing had been done under the contract. The plaintiff had his property and the defendant had not organized the company, and the question of damage was affected by the fact that the plaintiff was released from the obligation to transfer the property.

In the case at bar the plaintiff had transferred the property. The defendants had it, and when they had an opportunity to return it refused to do so, preferring to confirm their contract — an entirely different condition of affairs, even if the case of *Kirschmann* v. *Lediard* is to be considered as an authority upon this proposition as to the measure of damages. There is another circumstance to be considered in determining that question. There was no possibility whatever of the defendants in that case being able to procure the $50,000 worth of stock. The company never was organized; they could not get the stock; no money could procure it, and, consequently, there was no way of determining what it would have cost to furnish the stock under the contract.

In the case at bar it was entirely different. The property could be procured; it was only a question of paying the par value of the stock in order to obtain these shares. These two features clearly distinguish the cases and it cannot be considered as an authority in favor of the proposition that a party to a contract is to be allowed to make money out of its breach.

It is only necessary to call attention to the principles laid down in the case of *Bruce* v. *Welsh* (52 Hun, 524), where it is distinctly held that good morals certainly forbid that a man should be allowed to derive benefit from a violation of his obligations to others; and the question is asked : " Does the law permit a wrong-doer to retain to himself advantages thus gained as against the person whom he has wronged ? "

In the case at bar the adoption of any other rule of damages would enable these defendants to keep the property which had been transferred to them without paying a cent for it, because the payment of the $27,500 has nothing to do with the question now under consideration. Their rights would have been precisely the same had no such sum been mentioned in the contract and they had not been required to pay the same. Entirely in harmony with this proposition is the case of *Johnson* v. *Hathorn* (2 Abb. Ct. of App. Dec., 465).

It seems to us that the only rule which can be adopted as applicable to cases of this description is that the damage which the party sustains by reason of the breach of that contract, if the property has a market-price, is the market-price for the property, or if it has no market-price, what it would cost to procure the same if it was possible to do so. Any other rule of damages would relegate us to the realms of speculation alone. There would be no certainty, and it would be a violation of the rule to which attention has been called, viz., that the law will not allow a party to make a profit out of the violation of his contract to deliver certain articles which he is able to procure, but which he says it would be expensive for him to procure, and which, if he had procured them, would not have been of any use to the other contracting party. Of what avail the ownership of that stock would have been to the plaintiff we are not aware. It may have been of value to him outside of the mere question of market-value. He may have had projects for the successful prosecution of which the ownership of this stock was necessary, and is it to be said that where a man bargains for a particular piece of property which, he deems, is absolutely necessary for himself, but which may be worthless for anybody else, that he has no remedy because that piece of property, however valuable to himself, is worthless to others. We think, therefore, that an entirely erroneous rule was adopted as to the measure of damages, and that the proof as to what the plaintiff could have sold this property for was entirely immaterial. If it had no market-value, if it was not to be procured in the open market, then what it would have cost to procure it seems to be the only rational rule which could be adopted.

Another question which is involved is the referee's ruling dismissing the complaint as to the executors of Seligman. Seligman had

died before the action was commenced, and the suit was brought against Brown and the executors of Seligman without any allegation whatever as to the insolvency of Brown. It seems to us that the want of this allegation was fatal to the right of the plaintiff to recover as against the executors of Seligman. The contract sued upon was a joint obligation. It is clearly so from its language, and the general rule which prevails in reference to a contract is that, if several persons agree to perform a particular act, they are bound jointly and not severally in the absence of express words creating a several liability. This being a joint contract, at common law the death of Seligman freed him from the joint liability and absolutely discharged his estate. Equity, however, in order to prevent hardships of this kind arising from the technical rule of law, permitted the estate of a joint obligor to be sued on the allegation that the creditor could not obtain satisfaction from the survivor because of his insolvency or otherwise. This rule of equity has been adopted in this State and is part of its settled law.

It is urged, however, upon the part of the appellant, that there never having been any demurrer in this case, it has been held sufficient to prove the survivor's insolvency at the trial, in which case the complaint should be amended to conform to the facts proved.

It is a familiar rule that a complaint cannot be amended to conform to the facts proved where an objection has been taken in time to the proving of the facts because of the insufficiency of the pleadings, and the cases of *Van Riper* v. *Poppenhausen* (43 N. Y., 68), *First National Bank, etc.*, v. *Morgan* (73 id., 593) and *Pope* v. *Cole* (55 id., 124) in no way conflict with this proposition. The questions decided in those cases were, that where proof was given of the insolvency under proper averments a recovery might be had against the representatives of the deceased partner.

It is further sought by the appellant to limit this doctrine to cases of partnership contracts. But we see no reason for the limitation. In fact, in the case of *Pope* v. *Cole* the contrary doctrine is expressly recognized, although, perhaps, the question was not involved in the case. But the principles upon which those cases proceed, and the right to pursue the personal representatives rests, certainly make no such distinction as is claimed by the learned counsel; and that there is no distinction between the cases is apparent from the fact that it is

not a legal right which is attempted to be enforced, but an equitable one. It was because equity intervened for the purpose of relieving from the hardship which arose by the discharge of the estate of a joint obligor who died, that any right of recovery whatever exists ; and, in order that the hardship should exist, it is necessary that the impossibility of collecting the debt from the surviving obligor should appear. And hence arises the rule that upon showing the insolvency of the surviving obligor the estate of the deceased obligor may be called upon to pay. It being thus an equitable right simply which is enforced, the right to recover does not depend upon a question of partnership, but simply upon the fact that, in law, the estate of the joint obligor is discharged upon his death from any obligation under the contract.

We think that, without the allegations as to the insolvency of Brown, it is clear that no action could be maintained against the estate of Seligman. The sections of the Code, to which attention has been called, do not seem to apply to the question here, this action being brought against a survivor of two joint obligors and the representatives of one who is dead.

The question is also raised as to the refusal of the referee to allow the complaint to be amended. It is claimed by the counsel for the appellant that the referee refused to amend upon the ground that it was immaterial, and then excluded the evidence offered because such an allegation was not contained in the complaint. An examination of the record, however, does not support this proposition. It does not appear upon what ground the referee refused permission to amend. It is true that the amendment was objected to upon various grounds, among which was the one that it was wholly immaterial. The motion to amend was denied and the objection sustained and an exception taken, but upon what ground the motion was denied does not appear. The referee states in his opinion that he deemed it a matter of discretion, and there is nothing in the record which controverts this proposition. We do not think, under the circumstances, that the referee was bound to allow this amendment upon the trial. If the parties desired to make a more formal application than could be made upon the trial, they had the opportunity to resort to the court, when the court could impose such conditions upon the allowance of the amendment as in its judgment might be necessary.

But the referee was not compelled, in view of the situation of this case, to allow this allegation to be inserted as a matter of right; and having no power to impose terms which would protect the rights of the defendants who were to be brought in, we do not see that there was any abuse of the discretion of the referee in this respect which could furnish any ground for a reversal of the judgment as to the defendants Seligman.

There are also appeals from the orders granting extra allowances in this case. An extra allowance of $1,000 was granted to each of the defendants. Of course, this order must fall with the reversal of the judgment as to the defendant Brown, and we think that, in view of the circumstances of this case, such allowance as to the defendants Seligman was improvidently granted. The defendants Seligman had an opportunity to raise by demurrer the objection which they did raise on the trial. They neglected so to do, preferring to go on and raise the objection upon the trial. They should not be allowed, in view of this condition of affairs, to get more costs, which are within the discretion of the court, than they would have got had they interposed a demurrer.

We think, therefore, that the order granting them an extra allowance should be reversed, with ten dollars costs to the appellants, and that the judgment in favor of the defendants Seligman should be reduced to the su ` of $1,361.51, and affirmed for that amount, without costs, and th.. the judgment as to the defendant Brown should be reversed and a new trial ordered, with costs to appellant to abide the event.

DANIELS, J. :

It is not deemed absolutely necessary to add anything further for the disposition of this appeal to the reasons assigned by the presiding justice, whose opinion has concluded for the reversal of the judgment affecting the right of the plaintiff to maintain the action. But some further observations are deemed to be appropriate for the purpose of sustaining one of the conclusions which in that opinion has been reached. As to the disposition of so much of the principal appeal as relates to the liability of the executors nothing further is designed to be stated. But the more important feature of the litigation is that which includes the plaintiff's right to substantial

damages for the non-performance of the agreement or covenant made with him by the defendant Brown and Joseph Seligman, the testator. When this agreement was made the plaintiff was the president of the New York City Underground Railway Company, and prior to that time he owned and had claims against the company, and a title to subscriptions to its capital stock and an interest in a contract made with Francis P. Byrne, and owned sixty-odd shares of the capital stock of the company. These interests the defendant Brown and the testator were desirous of acquiring, and the object of their transaction with the plaintiff was their assignment and transfer to them.

At the time when the agreement was entered into there had been issued no more than 117 shares of the stock of the company. Other shares had been subscribed for, not exceeding sixty in number, and the defendant Brown and the testator were familiar with and informed of the affairs of the company prior to the making of this contract, and they then knew the fact to be that no more than 117 shares of the stock of the company had been issued, and that the stock subscribed for and not issued did not exceed sixty shares. It was in this condition of the affairs of the company, known to the defendant and the testator, that the contract was entered into by them with the plaintiff, and its construction and effect accordingly are to be ascertained, as far as they may be affected by those circumstances, with this knowledge existing in the minds of the defendant Brown and the testator. It was in consideration of the assignment and transfer of the interests, and the sixty shares of stock already mentioned to them by the plaintiff, that their agreement, which is the foundation of the action, was made and entered into. At that time an act, affecting the charter and rights of the company, was before the legislature, and it was covenanted and agreed by this defendant and the testator, for the consideration already mentioned, that upon the amendments then pending before the legislature becoming a law they would pay, or cause to be paid, unto the plaintiff, his representatives or assigns, the sum of $27,500, being the amount owing for advances made and services rendered by him to the company, and that they would cause to be delivered to him or his assigns, at the time of the payment of that sum of money, "two thousand shares of the capital

stock of the said railway company, which said stock is to be fully paid stock."

The agreement further provided that in the event that the amendments should not become a law at that session of the legislature, that the defendant Brown and the testator would either cause this sum of money to be paid and said 2,000 shares of stock delivered to the plaintiff or his assigns, or they would reassign to him or his assigns the claims, demands or rights so assigned to them, and transfer to him or his assigns the sixty shares of stock transferred to them, and that this should be done on the day succeeding the close of the legislature of that year.

The bill containing these amendments did not become a law, but it was rejected by the legislature. The defendant Brown and the testator did not, however, on that account, transfer back to the plaintiff the rights and interests acquired through the assignment from him, or the sixty shares of stock received by them, but they elected, as they were entitled to do so, to retain the stock and interests assigned to them, and to deliver to the plaintiff the 2,000 shares of the capital stock of the company mentioned in the agreement. They did pay to him the sum of money, which, in the event arising, they had become obligated to pay, but they did not deliver to the plaintiff the 2,000 shares of paid-up stock mentioned in the agreement. But after they had elected to retain the rights and interests and stock transferred to them, and to pay the money and deliver the 2,000 shares of paid-up stock to the plaintiff, they obtained from the company 2,000 shares of its stock and delivered that to him as paid up stock. No part of this stock, however, had been paid for in any manner to the company, and when that fact was ascertained by the plaintiff he disaffirmed this part of the transaction by tendering and offering to return these 2,000 shares to the testator, the defendant Brown being at that time absent from the United States, and he then demanded the 2,000 shares of fully paid-up stock which he had become entitled to receive under the obligation created by the agreement. This tender and demand was made in 1874, and it was repeated again in December, 1884, when the plaintiff was informed by the testator that he understood from Mr. Brown's counsel that all engagements with the plaintiff had been properly

fulfilled; and no further notice was taken of his demand and request. Upon the trial of the action the plaintiff offered to surrender these shares of stock as not being those he was entitled to under the agreement, and demanded judgment for so much money as would enable him to obtain 2,000 shares of the paid-up stock of the company.

It appeared upon the trial that the debts owing by the company greatly exceeded its assets, and that none of its stock was on the market for sale, and it had no marketable or actual value, and for that reason the referee; by his decision, limited the right of the plaintiff to recover against Brown, the surviving party who had executed the contract, to the sum of six cents. This limitation of the plaintiff's right to damages is deemed to be unwarranted by the contract, construed, as it should be, in the light of the circumstances attending its execution and delivery. At that time it was known to the defendant and the testator that the stock, in the event of their electing to abide by their right to make its delivery to the plaintiff, could not be obtained by purchase in the market, but must be procured from the company itself. This resulted from their knowledge and familiarity with the affairs and condition of the company, and it is further indicated by the obligation created in the agreement that no more than 100 additional shares of stock should be issued by the company, without plaintiff's consent, which consent, in fact, was not obtained; and that such shares as should be so issued should be transferred to the plaintiff, if they did not exercise their option of paying the $27,500, and delivering the 2,000 shares, on the failure of the amendment to become a law. This 100 shares was afterwards immediately issued to John S. Schultze for an indebtedness of the company to him, but no other shares of stock were issued by the company than those which have already been mentioned. There was no source, therefore, from which the 2,000 shares which these persons had become obligated to deliver to the plaintiff, could be obtained but from the company itself, and they could only be obtained from it by payment of the amount for which the company was authorized to issue the shares.

There was no other way or manner in which these shares could be obtained, and the defendant Brown and the testator were fully apprised of this fact, and yet their obligation was positive and explicit, in the event which has taken place, to deliver the 2,000

shares of paid-up stock to the plaintiff. He became absolutely entitled to these shares, and they as absolutely obligated themselves to deliver the shares; and as they were to be no otherwise obtained than from the company itself, they as clearly assumed the obligation to obtain the shares from the company and pay the amount which would be necessary for that purpose and then deliver them to the plaintiff. In these respects the obligation which was created materially differs from contracts ordinarily entered into for the sale and delivery of property. And the defendant Brown, as the surviving party, whose liability alone is to be disposed of in this action, for the fulfillment of the agreement, was bound to obtain the stock from the company and deliver it to the plaintiff, or pay him so much money by way of damages as would enable him to secure it for himself. That was the clear intent of the agreement.

What the law generally requires the party in default to do, for the satisfaction of a contract or obligation, is to pay to the other party so much money as will secure to him the ability to place himself in the position which, by the terms of the agreement, he was entitled to occupy. In ordinary cases that would be, where the consideration for the property had been paid, so much money as would enable the party not in default to purchase and acquire the property entitled to be received by him under the terms of the agreement. That would fully indemnify him for the loss to which he would be subjected by the failure of the other party to perform the agreement. But that rule is inapplicable to this case, for the article which was to be delivered was not one which was dealt with in the market. It could not be obtained by purchasing it from others. But the only manner in which it could be secured was from the company itself, and then only by paying to it the par value of the shares. The circumstances in this respect were peculiar. For the party not in default could in no other way obtain the benefit and advantage of the contract made with him than by obtaining these shares from the railway company; and where that is the nature of the agreement, there the ordinary rules applicable to the adjustment of differences are not to be followed. (*Ormsby* v. *Vermont, etc., Co.*, 56 N. Y., 623.)

What the law designs to secure to the party entitled to the performance of a contract made with him is such a measure of indem-

nity as will place him in the same position that he.would have been in if the contract had been observed and performed by the other party.

This subject was quite at large considered in *Baker* v. *Drake* 53 N. Y., 211). And it was there conceded, in deference to the early English authorities, that in an action on a bond conditioned for the return of government stocks, the party entitled to them should be fully reimbursed for the expense of obtaining them himself. And *Gruman* v. *Smith* (81 N. Y., 25) and *Colt* v. *Owens* (90 id., 368), are in harmony with this right. And so the law was declared to be in *Dana* v. *Fiedler* (12 N. Y., 41). That was a contract for the sale and delivery of "madder," and it was said in the decision by the court that "in a suit by the vendee against the vendor for non-delivery, his complete indemnity is to receive that sum which, with the price he had agreed to pay, would enable him to buy the article which the vendor had failed to deliver." (Id., 48.)

And in *Wright* v. *Bank of Metropolis* (110 N. Y., 237), the right of the plaintiff to recover was permitted to extend so far as to include the cost of replacing the article in dispute. And this rule also has the support of *Milliken* v. *McLean* (17 Week. Dig., 278) and *Scattergood* v. *Wood* (14 Hun, 269).

Cases have been cited and relied upon which were considered by the counsel to restrict the rule of damages so far as to limit the plaintiff to the market-value of the stock now in dispute. But the facts in each of these cases are entirely at variance with those controlling this controversy. And in each of them the rule applied afforded the party not in default all the indemnity he had become entitled to, while in the present controversy that rule would be entirely inadequate for the attainment of this result. Here the obligation assumed by the defendant Brown and the testator, with full knowledge of all the facts, was to deliver to the plaintiff 2,000 shares of paid-up stock of this company. There was no other possible mode of obtaining that stock than from the company itself. The knowledge of that fact by the covenantors is clearly evinced by all the circumstances surrounding the making of the agreement. And it must, therefore, have been intended that the shares should be obtained from that source for the performance of the obligation. The necessity for so obtaining them was known to these individuals, and with that knowledge they positively incurred the obligation to

deliver these shares to the plaintiff. That they have not done, and no other rule will suffice to place him in the position in which, by the agreement, these persons obligated themselves to place him, than that which will require the payment to him of so much money as he will be obliged to pay for the shares to the company, and in that manner supply himself with the articles he became entitled to receive under the express language of the agreement.

For these reasons, as well as those which have been stated at large in the opinion of the presiding justice, the law requires this judgment, so far as it is in favor of the defendant Brown, to be reversed and a new trial ordered.

As to the other matters which have been brought into discussion by the appeals taken in this action, they have been fully and completely disposed of in the opinion already mentioned, and as to them the directions suggested appear to be those required by the law to be made.

BARRETT, J. (dissenting) :

I find myself unable to concur with the presiding justice in his view of the measure of damages. His opinion is an exceedingly forcible exposition of the theory upon which alone the plaintiff can hope to recover the par value of the shares in question, and it is, therefore, with great diffidence and a due sense of what is needful to answer such vigorous thought convincingly, that I venture to present the opposite, and, as I conceive, correct view. I cannot, however, believe that any just legal principle requires us to mulct these defendants in the sum of $200,000 for the breach of a (partly executed) contract to deliver to the plaintiff a piece of paper representing 2,000 shares of full-paid, but utterly worthless, stock. For that is precisely what it comes to. The underlying thought which pervades the presiding justice's opinion, and which seems to have led to his ultimate conclusion, is, that unless the defendants are required to pay to the plaintiff this enormous sum, they will be permitted to profit by their own wrong. I have no fault to find with the principle which prevents such unrighteous profit, although I agree with Mr. Sedgwick that " the motives of the defaulter are not to be taken into view." The principle itself is just and well settled, but, as I conceive, wholly inapplicable to the special facts of

this case. It was formulated and well illustrated in *Suydam* v. *Jenkins* (3 Sandf., 620), where Duer, J., observed " that the owner to whom compensation is due must be fully indemnified, and the wrong-doer must not be permitted to derive any benefit or advantage whatever from his wrongful act." Judge Duer's opinion in this case received the most unqualified approval from the Court of Appeals in *Baker* v. *Drake* (53 N. Y., 220), where Rapallo, J., pointed out the true measure of damages in all actions, *whether founded upon contract or tort,* always excepting the special cases where punitory damages are allowed. " The law," he says, " awards to the party injured a *just indemnity* for the wrong which has been done him, *and no more,* * * * and the inquiry must always be what is *an adequate indemnity* to the party injured."

Now, the principle enunciated by Judge Duer, in *Suydam* v. *Jenkins,* and emphasized in *Bruce* v. *Welch* (52 Hun, 524) seems to me to have no possible application to the case at bar for the simple and obvious reason that the benefit or advantage which the defendants derived from their wrongful act was not such as could or should, under any circumstances, have enured to the benefit or advantage of the plaintiff. That would have been the case only where the defendants had procured the stock at par and sold it, in disregard of their bargain, at a higher price. The benefit or advantage which the defendants derived from their failure to purchase the stock was such as would have enured solely to the benefit *of the company,* and, indeed, the latter and its creditors were alone substantially interested in the specific performance of this part of the defendants' contract.

Now, the benefit or advantage contemplated by the principle in question is not the saving by the wrong-doer of what would otherwise be lost to him, but the actual gain which has gone into his pocket as the fruit of his injustice. It must not be lost sight of that the cardinal principle is indemnity, pure and simple, and that this principle has never been extended one hair's breadth beyond the refunding of actual gain, *which otherwise would or should have gone into the pocket of the wronged party.* This profit, as Judge Duer remarked, the wrong-doer " must in all cases be compelled to refund."

The doctrine necessarily contended for by the plaintiff, however,

is not that the defendants here must refund, for they have gained nothing by the use or conversion of the property which should have been delivered to the plaintiff, and, consequently, have nothing to refund, but that they must add to the sum required for his indemnity a further sum equal in amount to that which it was their contract duty *to lose.* In other words, as the defendants had agreed to deliver a valueless thing, which they did not possess, they were bound to secure it at all hazards or cost; and the measure of damages for failure to so obtain and deliver it is the sum for which alone such valueless thing could have been procured. Certainly this expenditure was not required for the purpose of indemnifying the vendor, nor to prevent the vendee from profiting at the vendor's expense by his own wrong. If, therefore, the amount which the plaintiff insists should have been thus expended is awarded to him as damages, such damages are simply and distinctly *punitive.* The defendants are punished for their refusal to engulf $200,000 in the company's treasury by a fine of that precise sum *payable to the plaintiff.* This is worse even than would be a decree for specific performance, for there the money would have to be paid into the company's treasury, and the plaintiff would only receive, in specie, the worthless though full-paid stock. It is apparent, then, that this sum of $200,000 has no relation to indemnity. The latter is measured by the real value of the stock, and can be measured by nothing else.

Then, as to profiting by the breach, what benefit have the wrong-doers here derived from their own injustice? Have they sold the 2,000 shares for more than the six-pence awarded? Have they ever had it in their power to do so? Not at all. Now this, as we have seen, is the nature of the profit which the law will not permit the wrong-doer to retain. This is clearly illustrated by Judge DUER in the following language: " Even where the market-value of the property, when the right of action accrued, would more than suffice to indemnify the owner, it is not, in all cases, that the liability of the wrong-doer should be limited to that amount. It is for the value *that he has himself realized or might realize* that he is bound to account, and for which judgment should be rendered against him. Hence, should it appear in evidence upon the trial that he had, in fact, *obtained, upon a sale of the property, a larger price than its value* when he acquired the possession, or that he still retained the

possession, and that *an advance price could then be obtained*, in each case the increase upon the original value (*which otherwise would remain as a profit in his hands*) ought to be allowed as cumulative damages." (P. 624.) Such, too, was the nature of the benefit which the landlord was not permitted to retain in *Bruce* v. *Welch* (*supra*).

It is characterized in like manner by Mr. Sedgwick. "It may, undoubtedly, be urged," he says, "and with force, that the contract being violated by the defendant, the retention *of any part of the plaintiff's money* is against conscience." (Sedg. on Damages [2d ed.], 274.) Indeed, as already pointed out, the principle of adding what Judge DUER called "cumulative damages" has never been extended beyond the direct pecuniary gain derived by the wrong-doer from the act of conversion or derivable from the continued possession of the property. It is said that the adoption of any other rule than that which allows the plaintiff as "cumulative damages" the sum which *it was the defendants' duty to lose* in the faithful performance of their contract, would enable the latter to keep the plaintiff's property without paying for it. But not so, for there can be no doubt that, with such a contract as the present, and under the circumstances surrounding it, the plaintiff could have returned the $27,500 of cash and the 2,000 shares of stock which were not full paid, and recovered back their property or its full value. If, however, after the defendants' refusal to deliver full-paid stock, the plaintiff chose to retain the cash, was not that plainly an election to treat his property *as well sold* at $27,500, plus *the real value* of 2,000 shares of full-paid stock ? Not plus its par value, nor plus the sum required to procure it, where such sum had no possible relation to its true or actual value, but plus the value of *a due proportionate interest in the capital, property, assets and franchises of the company*, measured by the bearing of 2,000 shares to the entire capital stock.

It is also claimed that when the defendants refused to deliver the stock the plaintiff had a right to procure it, and to charge the defendants with the cost. Assume that the plaintiff had this right, and it is a mere assumption, how is the situation altered ? In the first place, the plaintiff did not do this. But had he done it, the situation, so far as he is concerned, would have been unchanged. He would have squandered $200,000 upon a worthless piece of paper, not as

argued, upon something which subsequently became valueless, but which *was then*, and ever since has been, valueless. He would have, *pro tanto*, supplied a bankrupt treasury and enabled the company to pay about one-half of its debts, *thus benefiting the defendants, who are creditors of the company*. For it must not be overlooked, although the fact may have no special significance, that a part of the very property turned over to the defendants by the contract in question consisted of a claim of the plaintiff against this very company for some $12,000. Now, if the plaintiff upon paying this $200,000 into the company's treasury, and taking the full-paid stock therefor, could have recovered from the defendants the amount so paid, how would he have been the gainer? The recovery would simply have offset the payment, and, in the end, the plaintiff would have found himself in the possession of 2,000 shares of full paid but valueless stock. Thus, at last, he would have had what that stock was worth, and nothing more. Ultimately, therefore, he would have come into the inevitable six-pence. It comes to this, that in no way, manner or shape could the plaintiff have obtained from his contract aught save the full paid shares *or the intrinsic value of such full-paid shares.*

The plaintiff, undoubtedly, saw where the execution of this idea with regard to procuring the stock would lead, for he falls back upon the proposition that the rule of damages is the same whether he purchased the stock or not. In other words, he can recover, he thinks, the $200,000 although he has never paid a penny into the treasury of the company or otherwise obtained the stock. The fallacy of this position plainly consists in treating the stock called for by the contract as *issued* stock, purchasable in the market. There the stock has a market-value, and the wrong-doer can be charged with the sum required to replace it, within a reasonable time. (*Wright* v. *Bank of Metropolis*, 110 N. Y., 237.)

This rule as to replacing, however, is predicated upon the idea of value — market-value — throughout. The wrong-doer, where there has been a conversion, may be chargeable with the sum realized thereupon, or with a larger sum, if such larger sum is necessary to replace the stock within a reasonable time. But even in that case the replacing rule only applies to such replacing in the market or

at market-rates and value. If there is no market-value, the injured party cannot replace. He must, then, resort to proof of actual or intrinsic value, or to special damages resulting peculiarly to him from the want of the thing converted. If, for example, the entire stock of a particular company, including the shares converted, have fallen into the hands of one man, who has withdrawn the stock from the market, it might well cost the injured party millions to replace what ordinarily would be worth no more than $10,000. But who would dream of his recovering the millions from the wrong-doer, especially if he had never paid them? There is really no difficulty on this head when we keep clearly in view the fact that here the contract contemplated *unissued* stock, and the procurement of such stock by original subscription and purchase *from the company*. The replacing rule is necessarily inapplicable, simply because the stock is not upon the market and has no market-value. The sum necessary to be paid to the company to procure it is no more the criterion of damages than the millions necessary to be paid to the monopolist, who has bought up the entire capital stock of a particular company and made his own prices.

The nominal par value may be less than the intrinsic value, and less than the market-value after the stock has been issued and put upon the market. On the other hand it may be greater. The criterion must be either market or intrinsic value. All else is either fanciful, arbitrary or punitive. Look where the plaintiff's view would lead. The $200,000 are to go into his pockets and not into the treasury of the company. That is leading us away from the contract, which calls for the putting of the cash in the company's treasury *in any event*, whether the shares are subscribed for and purchased by the defendants in execution of their contract, or (upon their failure) by the plaintiff to procure what the contract failed for. In either case the defendants, as creditors of the company, would be entitled to share in the sum realized into the treasury. Now, however, the company is to get nothing, the plaintiff everything, and the defendants, as creditors of the company, are not even to have a dividend out of their own money in the plaintiff's pockets. All this is to happen because the company is and has been from the beginning utterly insolvent, substantially dead in its birth and its stock of the value of waste paper. And the conclu-

sion, from which I dissent, while it undoubtedly proceeds from a natural sense of equity, is not, in my judgment, controlled by the guiding principle of indemnity. It results rather from a determination in some way to specifically enforce that part of the defendants' obligation which is disadvantageous to them, though not appreciably advantageous to the plaintiff.

The stock, of course, had no market-value, because it had not been issued. It had no intrinsic value, because the company had no property *of any value,* and was over $300,000 in debt. These 2,000 shares of unissued stock simply represented one-fiftieth part of the capital, property, assets and franchise of the company, in effect, one-fiftieth part of what was $300,000 worse than nothing. In no view of the pleadings and proofs, therefore, could the plaintiff recover substantial damages. If the stock had neither market nor intrinsic value, it might still, it is true, have had some special value to the plaintiff; and if special damages were sustained by reason of the plaintiff's non-possession of the stock, they were recoverable. (*Scattergood* v. *Wood,* 14 Hun, 274; *Suydam* v. *Jenkins, supra,* 615, 620; *Sternfels* v. *Clark,* 2 Hun, 122.) But he was bound to allege such special damages in his complaint and prove them upon the trial. (*Parsons* v. *Sutton,* 66 N. Y., 96.) He has done neither.

While I agree, therefore, that if the stock was specially valuable to the plaintiff, though valueless to others, he could recover appropriate damages, still it cannot be doubted that the burden of showing such special value was upon the plaintiff. "Any other rule of damages," to quote an expression of the presiding justice, and to apply it in this connection where, in my judgment, it properly belongs, " would relegate us to the realms of speculation alone."

Having failed in showing market-value, intrinsic value, or value special to himself, the plaintiff's proposition that he is still entitled to $200,000, nominal par value, seems to me to be a most extraordinary one. It is nothing more nor less than a demand of exemplary damages. In my judgment, there was nothing left upon the facts found by the referee, facts which were so found upon competent evidence, than an award of nominal damages.

There are two minor considerations advanced by the plaintiff which should, perhaps, be briefly noticed. One is the suggestion of an analogy between the rule he contends for and the principle

which governs with regard to agreements to deliver bonds and notes. There is here no real analogy, because the company, by the issue of its stock, makes no agreement to pay any specific sum. But if it did, the result would be the same. For while it is conceded that the measure of damages upon failure to comply with such contracts is *prima facie* the face of the obligation, yet it is equally well settled that the insolvency of the obligors or makers may be shown in mitigation, and the damages thus reduced to a nominal sum. (*Thayer* v. *Manley*, 73 N. Y., 308, and cases there cited.)

The remaining consideration is the plaintiff's reference to that class of cases where the purchase-price is specified in money, payable, however, in stock or some commodity; such, for instance, as in *Johnson* v. *Hathorn* (2 Abb. App. Dec., 465). A different rule there applies, for the reason that the promise is to pay a fixed sum in a particular manner, not, as here, merely to deliver a specific thing. The present contract cannot well be tortured by any subtlety of construction into an agreement to pay $227,500 *in any form or manner.*

Upon all the other questions discussed I agree with the presiding justice, and although I am in favor of affirming the judgment as to Brown, I think the order granting him an extra allowance should be reversed, without costs. It is not a case where the plaintiff should be burdened any more than the law requires.

The judgment as to Brown should, therefore, be reduced to the sum of $1,364.02 and affirmed for that amount, without costs.

Order granting extra allowance to defendant Seligman reversed, with ten dollars costs to appellant. The judgment in favor of defendant Seligman to be reduced to $1,361.50 and affirmed for that amount, without costs. Judgment as to defendant Brown reversed and a new trial ordered, with costs to appellant to abide event.